Terri Wood, OSB #883325
Law Office of Terri Wood, P.C.
730 Van Buren Street
Eugene, Oregon 97402
541-484-4171
Fax: 541-485-5923
Email: contact@terriwoodlawoffice.com

Attorney for Jon Ritzheimer

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 3:16-CR-00051-02-BR |
| Plaintiff, | |
| -VS- | DEFENDANTS' REPLY TO GOVERNMENT'S RESPONSE TO DEFENDANTS' MOTION TO COMPEL PRODUCTION OF INFORMATION RE USE AND DISPLAY OF FORCE (#697) |
| JON RITZHEIMER, | |
| Defendant | |

Defendant Jon Ritzheimer, by and through counsel Terri Wood, and on behalf of

his co-defendants, submits the following Reply to the government's Response (#739)

in opposition to Defendants' Motion to Compel Production (#697).

**I. The government's discovery obligations are not constricted by its narrow views of what evidence is relevant to the charges and what constitutes a "legally viable defense."**

The government makes a sweeping rejection of producing any and all

information sought by defendants whose discovery motion articulated 18 specific

requests. The government does so based on two primary—and erroneous—premises:

First, its narrow view that "[t]he issue at trial will be whether there was an agreement by one or more people to impede officials from discharging duties of the United States and that each defendant joined in that agreement". Second, its misapprehensions regarding theories of defense. See Response (#739) at 2-8.

While the jury must decide the ultimate issue of whether the government has proved the charged conspiracy, that is far from the only issue for the jury. For example, the jury will decide whether the evidence supports various theories of defense; and the jury must determine both the credibility and bias of government agents, and the weight of the evidence against the accused.

"Rule 16 permits discovery that is 'relevant to the development of a possible defense.'" *United States v. Muniz-Jaquez,* 718 F3d 1180, 1183-84 (9th Cir. 2013)(citation omitted). This Court has already determined that defendants may pursue a First Amendment defense at trial. Law enforcement's display of force against peaceful protestors corroborates defendants' purpose in carrying firearms to symbolically proclaim themselves free men in the face of governmental tyranny and oppression, discussed in greater length in the Memorandum (#698). In addition, this Court's rulings regarding the Second Amendment neither address nor foreclose the constitutional self-defense theory outlined in the supporting Memorandum (#698).[1]

The government's arguments that these constitutionally-based defenses as well as common-law self-defense are not "legally viable," Response at 5-8, put the cart before the horse: The parties are in the pretrial phase, not closing arguments. The

---

[1] "The Court notes Defendants may contend at trial that their conduct was protected by the First Amendment and that they, therefore, did not violate [18 USC] §372." Order (#650), at 9 n.3; see Order (#649)(rejecting a purely facial challenge to Count 2, that the statute "directly violates the Second Amendment") at 10 & n.3.

information sought need not be admissible in evidence in order to be discoverable, so long as it is reasonably likely to lead to admissible evidence. *United States v. Price*, 566 F.3d 900, 912-13 (9th Cir. 2009)(discussing standards for determining pre-trial disclosure of *Brady* materials); see also, *Muniz-Jaquez, supra* at 1183 (noting Rule 16 discovery is "broader than *Brady*"). "[I]f doubt exists, it should be resolved in favor of the defendant and full disclosure made." *Price* at 913.

The government's narrow view of the case leads to its claim that "[t]he jury will not be asked to decide if law enforcement responded appropriately to the armed takeover of the MNWR," Response at 5, and its faulty conclusion that "[d]etails regarding the law enforcement response to the occupation are not relevant to the defendants' response to the government's case-in-chief," *id.,* at 6.[2] This ignores what the United States Supreme Court recognized more than 20 years ago: "A common trial tactic of defense lawyers is to discredit the caliber of the investigation or the decision to charge the defendant, and we may consider such use in assessing a possible *Brady* violation," *Kyles v. Whitley*, 514 U.S. 419, 446 (1995). "When, for example, the probative force of evidence depends on the circumstances in which it was obtained and those circumstances raise a possibility of fraud, indications of conscientious police work will enhance probative force and slovenly work will diminish it." *Id.,* 446 n.15.

Circumstances related to the FBI's conduct during the January 26th ambush of some defendants and the homicide of LaVoy Finnicum which are under investigation by the OIG and a federal grand jury "raise a possibility of fraud." That information is the subject of a separate motion and memorandum (#700 & #701). However, the FBI is

---

[2] The relevancy of the requested information to the defense was partially addressed in (#698), pages 7-10, and not reiterated here.

the lead investigative agency in this case. Whether it followed the policies and procedures contained in its written Rules of Engagement and Operational Field Orders in the days leading up to the ambush—as well as on that date and the days that followed—is material to the defense, as broadly recognized by *Kyles*, and further set forth in (#701), incorporated by reference herein. Whether those rules and orders authorized a display of massive force,[3] or other forms of psychological warfare, designed to provoke what could then be touted as violent action by protestors, and fed to the media to demonize defendants, is material to the defense.[4] Information that helps the defense "conduct an effective cross-examination" of government witnesses is "material" under Rule 16. *Muniz-Jaquez*, *supra*, at 1184; *United States v. Budziak*,

---

[3] As of January 10th, the FBI believed there were approximately "50 occupants" at the Refuge, but only "roughly 20 . . . have a weapon and engage in a security role." Those 50 include women and approximately 6 children. MNWR_0026533. This is the "heavily armed occupation" the government claims made "necessary" the law enforcement response that it resists fully disclosing. Response at 7-8. Discovery contains limited and date-restrictive FBI emails showing: On 1-10-16, 12 agents from field offices in Sacramento, Salt Lake City, San Francisco, Portland, and Seattle were ordered deployed for approximately two weeks to "shadow your respective SWAT teams in Burns" MNWR_0026549-50. In addition to multiple SWAT teams, the FBI deployed snipers (long before the ambush), MNWR_0026523, and Hostage Response Team(s) (HRT), MNWR_0026608. Oregon State Police and deputies from 17 Oregon sheriff's offices also deployed to Harney County during the sit-in at the Refuge.

[4] Defendants are entitled to show the FBI waged a "War of Words," where what was at worst trespass got repeatedly recast as domestic terrorism: For example, peaceful albeit armed protestors officially portrayed as "armed radicals" and "armed criminals" intimidating "innocent men, women and children" and seeking "occasions for confrontation." See Exhibit 101 (emails showing coordination between Gov. Brown and the FBI Director prior to Brown's 1-20-16 letter, quoted above). Collusive propaganda in this case underscores the FBI's bias and motive to justify military-style tactics against US citizens exercising their First and Second Amendment rights. Utilizing those tactics against protestors—the same used against domestic terrorists—has historically gotten the FBI in political "hot water." See, e.g., Office of Inspector General, "A Review of the FBI's Investigations of Certain Domestic Advocacy Groups," (September 2010); ACLU, "Unleashed and Unaccountable: The FBI's Unchecked Abuse of Authority," (September 2013). Avoiding congressional scrutiny, media backlash, and executive displeasure is a strong motive for the FBI to paint the Refuge protestors as terrorists.

697 F3d 1105, 1112 (9th Cir. 2012). Any evidence that a prospective government witness is biased or prejudiced against the defendant, or has a motive to lie, exaggerate, falsify, or distort his testimony is exculpatory. *See, United States v. Bagley*, 473 U.S. 667, 683 (1985).

Information that is not exculpatory or impeaching may still be relevant to developing a possible defense. *See United States v. Doe,* 705 F.3d 1134, 1151 (9th Cir.2013)("Even if the documents [requested under Rule 16] caused [defendant] to completely abandon [his] entrapment defense and take an entirely different path, the documents would still have been 'material to preparing the defense' under Rule 16(a)(1)(E)(i).").

The Ninth Circuit recognizes that even inculpatory evidence may be material. *Muniz-Jaquez*, *supra* at 1183 ("A defendant who knows that the government has evidence that renders his planned defense useless can alter his trial strategy. Or he can seek a plea agreement instead of going to trial."). Thus, for example, some defendants wish to argue that the FBI has an institutional bias against them dating back at least to the Nevada stand-off at the Bundy Ranch; and that bias has infected individual FBI agents; and that bias can be circumstantially shown at trial by reference to the Rules of Engagement, Operational Field Orders, and records or emails recounting daily briefings and intelligence analysts reports, whether those documents are admissible as tangible evidence or provide the basis for meaningful cross-examination. If defendants' expectation of what is in those records proves incorrect upon being granted pre-trial production, defendants may alter their trial strategy.

**2. The government's discovery obligations are not satisfied by bits and pieces of responsive information that defendants find through their own investigation, nor by what defendants' personally know about the facts.**

The government notes that some of the information at issue "may be gleaned from reports already provided." Response at 4. Discovery contains a smattering of some FBI agents' emails on sporadic dates during the protest at the Refuge, discussed in the next section of this Reply. The government asserts "existing discovery and [other] materials readily available to defendants provide ample evidence . . . [that] law enforcement officers responded to the occupation and did so equipped with firearms and other law enforcement equipment," such that the additional information at issue "is not material to the defense." *Id.,* at 7-8. The government also implies the defendants' personal knowledge of law enforcement's use and display of force is what is relevant, therefore excusing the government from providing any of the requested material. *Id.,* at 7.

The duty to disclose encompasses even those documents and statements the defense might already have, as well as information within the defendant's personal knowledge. *Gantt v. Roe*, 389 F.3d 908, 913 (9th Cir. 2004)(rejecting district court's conclusion that material evidence was not "suppressed" within the meaning of *Brady* because the defense could and should have discovered it itself); *United States v. Howell*, 231 F.3d 615, 625 (9th Cir. 2000). As the Ninth Circuit explained in *Howell*:

> The government's contention that it had no duty to disclose the [information] to the defense because Howell knew the truth and could have informed his counsel is wrong. The availability of particular statements through the defendant himself does not negate the government's duty to disclose. *See United States v. McElroy,* 697 F.2d 459, 465 (2d Cir.1982). Defendants often mistrust their counsel, and even defendants who cooperate with counsel cannot always remember all of the relevant facts or realize the legal importance of certain

occurrences. *See id.* Consequently, "[d]efense counsel is entitled to plan his trial strategy on the basis of full disclosure by the government regardless of the defendant's knowledge or memory of the disclosed statements." *Id.*

Furthermore, this Court's Rule 16 inquiry does not end merely because the government says the requested documents are not material. As the Ninth Circuit has instructed:

> In cases where the defendant has demonstrated materiality, the district court should not merely defer to government assertions that discovery would be fruitless. While we have no reason to doubt the government's good faith in such matters, criminal defendants should not have to rely solely on the government's word that further discovery is unnecessary.

*United States v. Budziak*, 697 F3d 1105, 1112-13 (9ᵗʰ Cir. 2012). See also, *Gantt, supra,* 912–913 ("*Brady* is not confined to evidence that affirmatively proves a defendant innocent").

Nor does the government fulfill its *Brady* obligation by making only partial disclosure. *See, Banks v. Dretke*, 540 U.S. 668 (2004)(giving defendant just enough to "seek out" evidence does not meet due process standard).

### 3. The information defendants seek is within the government's possession and control, and not "extraordinarily burdensome" to produce.

The government opines that records responsive to some specific requests seem unlikely to exist. Response at 9. However, the government has yet to communicate a response from the FBI or other involved agencies that its guess is correct. By addressing only "documents that inventory individuals and equipment responding to the occupation on a daily basis with the details requested by the defense" in this section of its Response,[5] the implication is that information responsive to the

---

[5] These items are described in 5 specific requests, #3-#8, (#697) at 3-4.

remaining 12 specific requests in the Motion to Compel does exist, but has not been produced because the government deems it not material to the defense.[6]

Defendants requested "all records, regardless of format and including photographs or videos, *containing information responsive* to the [18 numbered, specific requests in the motion]." (#697) at 2 (emphasis supplied). Defendants nowhere sought to compel the government to "compile and summarize information from multiple sources" in order to supply "an inventory of officers and equipment," Response at 9, if no inventory or partial inventory exists apart from the underlying source records. Given that all law enforcement data is digitized these days, the government has made no plausible claim that obtaining and supplying records containing responsive information would be "extraordinarily burdensome," *id.*

Furthermore, information culled from the public domain as well as the smattering of FBI emails from discovery support a strong inference that the government can readily obtain records relevant to the specific requests. Defendants have previously alerted the government to the following:

Emails obtained via public records requests to the Oregon Governor's Office show that state and local authorities were working as partners and under the direction of the FBI on matters including managing the media, preparing for a Mass Casualty Incident, and receiving information about the coordinated law enforcement response to the protest. See Exhibit 102, attached. Page 2 of that exhibit is a photo of the Daily Briefings schedule for Patrol, Public Information Officers, Command Post, Law Enforcement, and other divisions. Information provided during daily briefings would of

---

[6] Productive conferral regarding the specific items sought has been stifled by the government's blanket rejection of all items as not discoverable, ending discussion.

necessity be transmitted to others in the chain of command via email, text, etc., as well as be drawn from records documenting personnel present, weapons, gear, etc.

The Discovery contains BLM law enforcement emails noting the set up of the Joint Information Center, MNWR_0028563; that the FBI and state/local law enforcement established a Joint Incident Command Center as of 1-4-2016, MNWR_0028564; and that the FBI receives information from other law enforcement agencies involved in the investigation and response to the protestors, MNWR_0028561.

Discovery also contains a small number of FBI emails that pertain to some activities on several days during the protest. Those emails include discussion of sniper placement, MNWR_0026523; discussion of particular SWAT team rotations, MNWR_0026527; deployment of personnel for SWAT teams, MNWR_0026531; the SITREP report for January 10th (indicating there is at least one of these FBI Intelligence Analysts reports generated each day assessing the threat posed by protestors, among other relevant topics), MNWR_0026533; reference to the "FBI Accountability Matrix— Burns Response" that "contains a list of personnel at the Forward CP, TOC, NOC, and other locations," MNWR_0026534;[7] information that a militia organization, the PPN, has gathered regarding FBI bringing in a combat surgical team, military-style air assets, and other signs of law enforcement build-up, MNWR_0026551; FBI Bearcat transported through Burns to Bend, MNWR_0026563; Operations OGURA and Anaconda, MNWR_0026553-55; and talking points used with protestors, including "if you point a weapon at law enforcement . . . deadly force may be used," MNWR_0026564.

---

[7] "CP" is thought to mean Command Post; "TOC" to mean Tactical Operations Center; "NOC" is unknown to defendants.

Because the government has already disclosed information via these few emails that is material to the motion at hand, the government could readily obtain the rest of the emails from involved agents and for the days not covered. It appears from those sources Defendants could compile the information sought by their motion. The government could also readily obtain official records, such as the "FBI Accountability Matrix—Burns Response" that supplies information on total number of agents (and perhaps other information concerning weapons, vehicles and aircraft on hand). It is also reasonable to assume the Joint Incident Command Center would have records of the number of state and local police agents and their assignments (e.g., sniper duty), as part of the command process.

## Conclusion

Through the Motion (#697) and Memorandum (#698), the related Memorandum (#701) incorporated by reference, and this Reply, Defendants have identified case-specific records and categories of records, in the government's possession, and made the threshold showing that this information is helpful to the defense. The information is helpful to the preparation and presentation of possible defenses at trial, corroboration of Defendants' non-criminal intent, and meaningful cross-examination of government agents, whether called as witnesses by the prosecution or defense. This Court should therefore grant the Motion To Compel Production (#697), or if it has concerns not addressed in the pleadings, set oral argument for the July 6th status conference.

RESPECTFULLY SUBMITTED this 27th day of June, 2016.

/s/ Terri Wood
_____
TERRI WOOD  OSB  883325
Attorney for Ritzheimer