BILLY J. WILLIAMS, OSB #901366
United States Attorney
District of Oregon
**ETHAN D. KNIGHT, OSB #992984**
**GEOFFREY A. BARROW**
**CRAIG J. GABRIEL, OSB #012571**
Assistant United States Attorneys
ethan.knight@usdoj.gov
geoffrey.barrow@usdoj.gov
craig.gabriel@usdoj.gov
1000 SW Third Ave., Suite 600
Portland, OR 97204-2902
Telephone: (503) 727-1000
Attorneys for United States of America

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

| | |
|---|---|
| **UNITED STATES OF AMERICA** | 3:16-CR-00051-BR-04 |
| v. | **GOVERNMENT'S SENTENCING MEMORANDUM** |
| **RYAN PAYNE,** | |
| **Defendant.** | **Sentencing Date: February 27, 2018** <br> **10:00 a.m.** |

The United States of America, by Billy J. Williams, United States Attorney for the District of Oregon, and through Ethan D. Knight, Geoffrey A. Barrow, and Craig J. Gabriel, Assistant United States Attorneys, submits this memorandum for defendant Ryan Payne's sentencing, which is currently set for Tuesday, February 27, 2018, at 10:00 a.m.

I.   **SENTENCING RECOMMENDATION**

The government recommends that the Court impose a sentence of 41 months' imprisonment on Count 1 (18 U.S.C. § 372), a three-year period of post-prison supervision, and a $100 assessment.  The Court previously entered an Order setting forth the terms of restitution imposed in connection with the conviction for this offense.  (ECF No. 2259.)

II.  **BACKGROUND**

A.   **Procedural Background**

On January 26, 2016, defendant was arrested.  That same day, Magistrate Judge Stacie F. Beckerman authorized a complaint charging Payne and six others with Conspiracy to Impede Officers of the United States from Discharging Their Duties Through the Use of Force, Intimidation, or Threats in violation of Title 18, United States Code, Section 372.  Defendant made an initial appearance on the Complaint on January 27, 2016, and Judge Beckerman ordered that he be detained.  On February 3, 2016, a grand jury in the District of Oregon charged defendant with a single count of 18 U.S.C. § 372.

On March 8, 2016, the grand jury returned a Superseding Indictment charging defendant with Conspiracy to Impede Officers of the United States from Discharging Their Duties Through the Use of Force, Intimidation, or Threats in violation of Title 18, United States Code, Section 372 (Count 1); Possession of Firearms and Dangerous Weapons in Federal Facilities in violation of Title 18, United States Code, Sections 930(b) and 2 (Count 2); and Use and Carry of a Firearm in Relation to a Crime of Violence in violation of Title 18, United States Code, Sections 924(c)(1)(A) and 2 (Count 3).  On June 10, 2016, this Court dismissed Count Three of the

/ / /

Superseding Indictment on the grounds that 18 U.S.C. § 372 did not qualify as a "crime of violence" within the meaning of 18 U.S.C. § 924(c)(1)(A).   (ECF No. 621.)

On July 19, 2016, defendant entered a plea of guilty to Count One of the Superseding Indictment.   (ECF No. 904.)   On October 12, 2016, defendant Payne moved to withdraw his plea of guilty.   (ECF No. 1421.)   On December 28, 2016, this Court denied the Motion. (ECF No. 1642.)

      **B.**    **Factual Background**

The underlying facts of defendant's case are accurately set forth in paragraphs 14 through 36 of the Presentence Report (hereafter "PSR").

      **1.  Pre-Occupation**

Defendant Payne has a long history of opposing the authority of the federal government. In 2013, Payne cofounded Operation Mutual Aid (OMA).   The purpose of OMA was to create a network of militiamen to respond to situations involving conflict with the government and law enforcement.   In 2014, OMA issued a formal call to action for militia forces to respond to Bunkerville, Nevada, to support the Bundy family's conflict with the Bureau of Land Management (BLM).   In April of 2014, Payne traveled to Nevada and was named "Militia Coordinator" for the Bundy family.   He recruited and organized armed militia groups to respond to the confrontation with the BLM.

After BLM suspended the impoundment action, Payne and others cited the events in Bunkerville, Nevada, as a significant victory for their movement and evidence that the federal government lacked authority to manage federal lands.

/ / /

In a June 2014 interview with a local paper, Payne boasted about serving as Cliven Bundy's militia liaison and having "counter-sniper positions on their sniper positions. We had at least one guy—sometimes two guys—per BLM agent in there. So, it was a complete tactical superiority. . . . If they made one wrong move, every single BLM agent in that camp would've died." *See* Ted McDermott, *Freedom Fighter*, Missoula Ind., June 12, 2014. In a June 2014 audio interview, Payne talked about working to release anyone detained for their participation in the events in Bunkerville:

> In the event that they start arresting people . . . particularly those that went there and they either stood guard, they stood in front of the Bundy's, they pointed guns at the BLM . . . the instant that one of those men is arrested, and there are not viable charges that are unrelated to this incident . . . that will become our main effort. I will divert every ounce of energy I have to getting that person released, and I mean in any way shape or form. I will pursue them to the ends of this earth.

In the same interview, Payne talked about forming Operation Mutual Defense (OMD) to fulfill the same mission as OMA.[1]

Following the events in Bunkerville, Payne actively promoted the idea that further conflicts with the federal government were needed and that the path forward was through the use of "Committees of Safety."

In June of 2014, Payne cofounded Operation Mutual Defense (OMD). OMD's stated purpose was similar to OMA in that it sought to identify and respond to conflicts with the federal government. Payne, codefendant Jon Ritzheimer, and others served on the Advisory Board for OMD. The group held regular telephonic meetings throughout the fall of 2015 in which they

---

[1] The interview was reviewed by an agent on June 13, 2014. At that time, the interview was publicly available at available at: http://patriotsinformationhotline.com/discussion/189/jerry-bruckhart-ryan-payne-interview.

**Government's Sentencing Memorandum**                                                  **Page 4**

proposed various OMD "missions" in which they would dispatch armed militiamen to confront the federal government. The group recorded their meetings and uploaded the recordings to an Internet website.[2] In one such meeting, they established a "response matrix" to rate potential missions. The missions were ranked on a scale of one to five. A level-five mission was for "an event that appears to have no resolution absent violent confrontation." Ex. A, at 10.

### 2. Planning the Occupation

As the Court learned through evidence presented at trial, Ryan Payne was a central figure in planning the takeover of the Refuge. As Sheriff Dave Ward testified, defendant Payne traveled to Harney County and met with him on several occasions. Payne repeatedly expressed his view that the federal government had no authority in Harney County and that it was Sheriff Ward's duty to intervene to prevent Dwight and Steven Hammond from surrendering to serve their court-ordered sentences. Payne and Ammon Bundy threatened to bring extreme civil unrest to Harney County. Payne warned Sheriff Ward that they would not be able to control what those responding to the call might do.

When Sheriff Ward did not comply with Payne's demands, Payne met with Deputy Sheriff Brian Needham and told him that he had a duty to remove Sheriff Ward by any means necessary, including death. Payne and Ammon Bundy also met with the Hammond family and encouraged them not to comply with the court's sentencing order. Payne promised that the militia would respond as they had in Bunkerville, Nevada, and would prevent the government from taking the Hammonds into custody.

---

[2] The government obtained the recordings pursuant to a search warrant. The recordings are lengthy. They were reviewed by an FBI agent who prepared a report that includes summaries and quotations from the recordings. The agent's report is attached at Exhibit A.

**Government's Sentencing Memorandum**                                                           **Page 5**

In an OMD meeting on October 18, 2015, Payne initiated a discussion of an OMD "mission" in response to the resentencing of Dwight and Steven Hammond.  Ex. A, at 6. Payne told the group that he talked to Dwight Hammond the week before.  The group discussed a plan in which the Hammonds would stay on their Harney County ranch and the militia would prevent the federal government from taking the Hammonds into custody.  Ex. A, at 8.

On November 5, 2015, Payne participated in an OMD meeting in which he described the Hammond resentencing as "the next big event."  *Id.* at 23.  He described the resentencing as a "gross overreach" that would set a precedent of "corruption and tyranny . . . to such a high degree that I'm not sure how it . . . would come back without some form of violence."  *Id.* Payne told OMD that he met with Susan Hammond and told her that her family had to decide, "whether you're going to watch as we defend your liberties, or you're going to stand with us as we defend your liberties . . . regardless, it's looking like we're gonna defend your liberties whether you want it or not."  *Id.* at 25.  The group then discussed potential options if the Hammonds did not request OMD support.  One such option was to call for a demonstration at the courthouse with 200 armed militiamen who would seize the courthouse and demand that the judge overturn her decision resentencing the Hammonds.  *Id.* at 27.  Payne also discussed attempting to break William Wolf, who was then in federal custody on firearms charges, out of custody.  Drawing on his experience in Bunkerville, Payne explained the strategic importance of creating "cohesion between the protest movement and the militia effort."  *Id*. at 29.  He suggested that shielding militiamen within protesters could be used to stage a "dynamic entry" into a prison.  *Id.*

/ / /

**Government's Sentencing Memorandum**                                                        **Page 6**

In a November 8, 2015, OMD meeting, the group discussed breaking Wolf out of custody while he was being transported by U.S. Marshals. Payne supported the idea, and he reiterated his position that if anyone were arrested in connection with an OMD mission, "I would personally pursue operations in order to make sure they were free." *Id*. at 33.

On November 19, 2015, Payne updated OMD on his meetings with Ammon Bundy, Sheriff Ward, and the Hammond family. He discussed efforts to pressure Sheriff Ward into supporting the militia. Payne reiterated his view that OMD had a duty to prevent the Hammonds from surrendering to serve their federal sentences even if it was against their will. *Id.* at 53. Other OMD members argued that OMD should not get involved until the Hammonds requested assistance. Payne strongly disagreed:

> Well then, I guess the way that I feel is that we don't have the same goal. My goal is to stop tyranny. I quite honestly don't care if the people want to, are going to submit themselves to tyranny, or not. My goal is to stop tyranny.

*Id.* at 54.

In a meeting on November 29, 2015, the OMD board formally decided that the group would not respond to Harney County unless the Hammonds asked for help. Payne announced that he would travel to Harney County the next day. When asked if he was going to the Hammonds' ranch, he told the group that he was going to the Malheur National Wildlife Refuge. *Id*. at 60. He then introduced the false narrative that became a justification for the occupation— that the expansion of the Refuge forced local ranchers out of business and harmed wildlife. *Id*.

On December 6, 2015, four days after the mass shooting in San Bernardino, California, Payne told OMD, "we are in a state of war." *Id.* at 66. He described two enemies: the federal government and radical Islam. *Id.* In his view, the federal government was the "bigger

problem" because it was "the root of all the problems within our own borders and it's the root of many problems throughout the world." *Id.*

In December of 2015, Schuyler Barbeau, a bodyguard for Cliven Bundy, was arrested in Washington on federal firearms charges. In a December 8, 2015, OMD meeting, the group discussed Barbeau's arrest and "the commitment made to the people that have been willing to stand up defying the federal government." *Id.* at 79. Payne told the group of a plan to break Barbeau out of federal custody. *Id.* at 79-80.

On December 15, 2015, Ammon Bundy and Ryan Payne held a meeting in Harney County. Ammon Bundy outlined his family's confrontation with the federal government and how they successfully prevented the enforcement of federal court orders. Ammon Bundy told the group that they could stand up to the government with the aid of the militia. He told the crowd that the issue was about more than the Hammonds. Their purpose was to remove the federal government from Harney County. Bundy and Payne explained that through the use of a Committee of Safety, the community could call on the assistance of the militia. Seven members of the community were called upon to form a Committee of Safety.

On December 20, 2015, Payne briefed OMD on the formation of the Harney County Committee of Safety. Payne explained that he and Ammon Bundy served as advisors to the committee. Payne planned to have the committee issue a request for militia groups to respond to Harney County. Ex. A, at 81.

  3. **Defendant's Role in the Occupation**

After planning the occupation, Payne played a leading role in its execution. He was a member of the team that raided the Refuge with firearms on January 2, 2016. On January 3,

2016, Payne posted to social media to proclaim that they were off to a good start and to encourage others to join the occupation.

On January 11, 2016, Ammon Bundy, Ryan Bundy, Ryan Payne, Jon Ritzheimer, Blaine Cooper, Jason Patrick, and others removed a fence in order to allow cattle to graze on the Refuge.

Ammon Bundy identified Payne's role at the Refuge as "Defense."  Gov't Trial Ex. 25, Feb. 2017 Trial.  In that role, Payne helped to organize and train occupiers in military tactics. They took notes of their training that the government introduced at trial.  On January 24, 2016, Ryan Payne and others fired weapons at the Malheur Field Station.  They left after volunteers who work at the field station discovered them.  Trial Tr. 953-57, Feb. 23, 2017.  The following day, Payne led a group of men firing hundreds of rounds of ammunition at the boat launch. Gov't Trial Ex. 32, Feb. 2017 Trial.

Throughout the occupation, Ryan Payne used social media, including his Facebook account, to communicate with indicted coconspirators and others and to recruit people to support the occupation.

On January 26, 2016, defendant Payne was arrested as he and the other leaders of the occupation were traveling from the Refuge to John Day, Oregon.  In a post-arrest statement, Payne restated his belief that the federal government cannot lawfully own land.  Payne claimed he was not violating the law by occupying the Refuge.  He admitted to having guns at the Refuge and claimed that the guns were there to protect the occupiers.

/ / /

/ / /

**Government's Sentencing Memorandum**                                                **Page 9**

### C.     Defendant's Conduct While on Release

In late 2017, defendant was released in his Nevada case and given permission to travel home for the holidays.    His release conditions in Nevada and Oregon included no contact with codefendants.    (ECF No. 2367.)    On December 22, 2017, he violated his release conditions when he traveled to Ammon Bundy's temporary residence where he posed for a photograph with Ammon Bundy and Jon Ritzheimer.    The following day, he violated his release conditions by driving to Bundy Ranch where he posed for additional photographs with Ritzheimer.

### III.    ADVISORY SENTENCING GUIDELINE CALCULATION

The government believes that the U.S. Probation Office has accurately calculated defendant's advisory guidelines and criminal history.    Pursuant to the terms of the plea agreement, there are no disputed guideline issues for the Court to resolve.

### A.     Offense Conduct

#### 1.    Base Offense Level

The Base Offense Level is 10 pursuant to U.S.S.G. § 2A2.4(a).    *See* PSR ¶ 42.

#### 2.    Possession and Use of a Dangerous Weapon U.S.S.G. § 2A2.4(b)(1)(B)

Pursuant to U.S.S.G. § 2A2.4(b)(1)(B), a three-level increase applies because "a dangerous weapon (including a firearm) was possessed and its use was threatened." Defendant's conduct supports a three-level adjustment under U.S.S.G. § 2A2.4(b)(1)(B). Defendant possessed firearms throughout his time on the Refuge and the purpose of carrying and using the firearms was to threaten.    Defendant personally used a firearm to clear the Refuge on January 2, 2016, he carried firearms while on the Refuge to support the ideological mission of the occupation, and he trained others in the use of firearms on the Refuge.

**B.     Adjustments**

    **1.  Role Enhancement**

Defendant was an organizer and leader of the occupation.  Pursuant to U.S.S.G. § 3B1.1(a), a 4-level role enhancement applies because the "criminal activity . . . involved five or more participants or was otherwise extensive."  Defendant was a leader and an organizer of one of the most extensive criminal activities in Oregon history.  The parties agree that a four-level enhancement is appropriate.

    **2.  Upward Departure**

Because the offense in this case "was calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct," an upward departure applies under Application Note 4 to U.S.S.G. § 3A1.4.  The parties jointly agree that a ten-level upward departure applies to this case.

Defendant's conduct fits squarely within Application Note 4 of U.S.S.G. § 3A1.4.  The entire purpose of the occupation was to influence or affect the conduct of the federal government through what could be benignly described as coercion or intimidation.  A ten-level adjustment is reasonable and appropriate.

Defendant has a Total Offense Level of 27.

    **3.  Acceptance of Responsibility**

Pursuant to U.S.S.G. § 3E1.1, defendant is entitled to a three-level downward adjustment for acceptance of responsibility.

/ / /

/ / /

### 4. Early Disposition

The parties jointly recommend that the Court apply a two-level downward variance under 18 U.S.C. § 3553(a) in light of the defendant's early disposition of a complex case.

### C. Criminal History

Defendant has no known criminal history. He is in Criminal History Category I.

### D. Advisory Guideline Sentence

Under the advisory guidelines, defendant is at Total Offense Level 22, Criminal History Category I, for a suggested guideline range of 41 to 51 months' incarceration.

## IV. 18 U.S.C. § 3553 Factors

Title 18, United States Code, Section 3553(a) requires this Court to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in [18 U.S.C. § 3553(a)(2)]." That paragraph focuses on the "need for the sentence imposed" to:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> (B) to afford adequate deterrence to criminal conduct;
> (C) to protect the public from further crimes of the defendant; and
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

The seriousness of the offense in this case is measured by the disruption and dislocation defendant's conduct caused the community in Harney County, Oregon. It includes the impact the occupation had on the lives of the employees who worked at the Malheur National Wildlife Refuge and the BLM District Office. It includes the cost of the law enforcement response to the armed occupation of the Refuge and the damages the occupation caused the Refuge itself. It includes the desecration of land viewed as sacred by the Burns Paiute Tribe. The seriousness

///

of the offense is apparent from the fact that more than two years after defendant was arrested, the community is still recovering.

The occupation was born of a profound disrespect for the law. The occupiers generally and defendant specifically had no respect for the law that grants the federal government the authority to own land. They did not respect the authority of the federal courts to order the Hammonds to report to serve a lawful sentence. They did not respect law enforcement's role in enforcing the law. A significant sentence is necessary to reflect the seriousness of this offense, promote respect for the law, and to provide just punishment for defendant's role as an architect and leader of the occupation.

As this Court has noted in sentencing defendant's coconspirators, specific and general deterrence plays an important role in this case. The occupation did not occur in a vacuum. Instead, it followed a series of events deliberately planned as armed confrontations with the federal government. Defendant Payne was an integral part of this effort. He formed two groups that were dedicated to promoting such conflicts. A significant sentence in necessary to deter defendant and others from engaging in similar criminal conduct and to protect the public.

The government is not aware of any unusual needs for educational, vocational, medical, or correctional treatment.

The Court is also directed to consider the "nature and characteristics of the offense and the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1). The nature and characteristics of the offense are set forth above. Limited information is available regarding the history and characteristics of the defendant. He served honorably in the U.S. Army for five

/ / /

**Government's Sentencing Memorandum**                                                                 **Page 13**

years.   He does not appear to suffer from the maladies that several of his codefendants cited as mitigation.

## V.     An Additional Downward Variance Is Unwarranted

The recommends that the Court apply an additional four-level downward variance.   PSR at 22.   The only justification for this variance is the fact that defendant has served almost two years of pretrial detention and that half of that time has been spent in county jails.   The Court should reject this variance.   The Bureau of Prisons will give defendant credit for the time he has served in pretrial detention.   The fact that he served part of that time in county jails does not justify a four-level variance.

## VI.    Restitution

Defendant Payne has previously stipulated to a $10,000 restitution order in this case.  *See* ECF No. 2259.

## VII.   Conclusion

For the reasons stated above, the government recommends the Court impose a 41-month sentence for defendant's convictions.   This is an appropriate, reasonable sentence that adequately addresses the objectives of sentencing set forth at 18 U.S.C. § 3553(a) and defendant's conduct in the underlying case.

Respectfully submitted this 21st day of February 2018.

BILLY J. WILLIAMS  
United States Attorney

*s/ Geoffrey A. Barrow*  
GEOFFREY A. BARROW  
ETHAN D. KNIGHT, OSB #992984  
CRAIG J. GABRIEL, OSB #012571  
Assistant United States Attorneys

**Government's Sentencing Memorandum**                                                                                                **Page 14**