Lisa Hay, OSB #980628
Federal Public Defender
101 SW Main Street, Suite 1700
Portland, Oregon  97204
Tel:    (503) 326-2123
Fax:    (503) 326-5524
lisa_hay@fd.org

Attorney for Defendant

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                    Plaintiff,<br><br>            v.<br><br>RYAN W. PAYNE,<br><br>                    Defendant. | Case No. 3:16-cr-00051-BR-4<br><br>**DEFENDANT'S SENTENCING MEMORANDUM** |

Defendant Ryan Payne will appear before the Court on February 27, 2018, for sentencing upon his plea of guilty to one count of Conspiracy to Impede Officers of the United States in violation of 18 U.S.C. § 372.  For the reasons below and as outlined in other sentencing materials before the Court, the defense is requesting a sentence of 24 months for Mr. Payne.  The U.S. Probation Office recommends a sentence of 27 months, while the prosecution has agreed to request a sentence of no more than 41 months.

**I.     U.S. Sentencing Guideline Calculations**

On July 14, 2016, Mr. Payne signed a plea agreement drafted by the government that bound him to accept the following guideline calculations:

PAGE 1.     DEFENDANT'S SENTENCING MEMORANDUM

7. **Guideline Calculation**: The parties agree that defendant's advisory guideline calculation is as follows:

- **Base Offense Level is 10** under U.S.S.G. § 2X1.1(a) and U.S.S.G. § 2A2.4(a).
- Because a dangerous weapon was possessed and its use was threatened, a **3-level upward adjustment** applies under U.S.S.G. § 2A2.4(b)(1)(B) and U.S.S.G. § 1B1.3(a)(1)(B).
- Because the offense was calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct, a **10-level upward departure** applies under Application Note 4 to U.S.S.G. § 3A1.4.
- Based on defendant's leadership role in the offense, a **4-level upward adjustment** applies under U.S.S.G. § 3B1.1.
- For defendant's acceptance of responsibility, a **3-level downward adjustment** applies under U.S.S.G. § 3E1.1.
- For defendant's early disposition of this complex case, a **2-level downward variance** applies under 18 U.S.C. § 3553(a).

These calculations result in an agreed offense level of 22.

Because the defense is bound by this agreement, this pleading does not dispute the applicability of any guideline enhancement. The Court, of course, is obligated to make its own determination of the validity and extent of any enhancements. This pleading instead focuses on reasons for a variance of five levels, to Offense Level 17, which would result in a low-end recommended sentence of 24 months.

In summary, reasons for a variance include:

1. Double-counting based on leadership within the guideline enhancements. Mr. Payne agrees he was one of the leaders of the occupation and the 4-level increase is warranted. Other enhancements, however, are also calibrated to reflect Mr. Payne's role as a leader (e.g., 10 levels under Application Note 4), resulting in a 17-level increase to a base offense level that started at only 10. The overall effect of these enhancements is unduly punitive and a downward variance is warranted to offset this effect.

2. The need to avoid unwarranted disparity among co-defendants. Although Mr. Payne's leadership role distinguishes him from some of the sentenced co-defendants, many mitigating factors exist in his case that are not present in others. The government's recommended sentence is disproportionately higher than the sentences received by others.

3. The nature of the offense, including Mr. Payne's role as a political theorist and activist. Mr. Payne viewed his role during the occupation as protection of others against violence, and he denies ever explicitly threatening violence. Although many during the occupation turned to videos, radio and YouTube to espouse anger at the government or to make specific threats, Mr. Payne did not. Mr. Payne pled guilty and recognizes that his actions, and specifically his carrying a firearm, were intimidating and perceived as threatening, but his intent was not to cause chaos or harm.

4. Mr. Payne's history and characteristics, including his honorable military service, starting at age 17, that involved two tours of combat duty in Iraq. Letters from people who know him well attest to Mr. Payne's work ethic, integrity, honesty and compassion. Mr. Payne is not a hot-headed, violent, anti-authoritarian rebel who sought provocation for its own sake or for notoriety. He is a thoughtful, calm, disciplined, and principled person, who believed he was acting in accordance with his oath to uphold the Constitution but who now understands that his actions resulted in harm to others and had the opposite result than he intended.

5. The expert opinion of sociologist Dr. William Brown, who interviewed Mr. Payne and reviewed his military records. Dr. Brown's report provides detailed information on the effect of military indoctrination, and specifically in Mr. Payne's case on the effect of "moral injury" on Mr. Payne from his military experiences. This background provides context to Mr. Payne's desire to hold those in power accountable under the Constitution and his attraction to a political theory based on irrefutable founding principles. Dr. Brown found Mr. Payne amenable to treatment and suggests a program for veterans in Anaconda, Montana, for Mr. Payne.

6. The expected testimony and expert opinion of psychologist Dr. Suzanne Best, who evaluated Mr. Payne in March of 2016, shortly after his arrest, and who was able to interview him again in February of this year, after Mr. Payne had spent almost two years in custody reflecting on his experiences, his mistakes, and his future goals. Dr. Best diagnosed Mr. Payne with PTSD in 2016 resulting from his military experiences, but sees him as having evolved in his thinking over the course of the two years. She found his remorse and pro-social thinking to be sincere.

7. Mr. Payne's letter of apology, which describes his recognition and acceptance of the Court's authority, his understanding of what he has lost as a result of his actions and the reaction to them, and his contrition. Mr. Payne's self-education after high school through intensive reading in early American historical documents is evident in his writing style, but his dismay at the dishonor and tarnish to his integrity that he has brought upon himself comes through clearly. He will tell the Court during the sentencing proceeding that he does not intend to engage in acts of political activism or public demonstrations any more, and has plans for helping others in Montana.

## II.     Grounds for Downward Variance

### A.     *Double-Counting Based on Leadership Within the Guideline Enhancements.*

The agreed guideline enhancements almost triple the base offense level, from 10 to 27. The Court should consider the evidence supporting such an increase with care. *See, e.g., United States v. Hopper*, 177 F.3d 824, 833 (9th Cir.1999) (requiring extra level of proof when sentencing factors have an extraordinary effect on sentence). Under the circumstances of this case, the enhancements each take into consideration Mr. Payne's leadership role as an aggravating factor, which cumulatively would result in excess punishment. Mr. Payne does not dispute the 4-level increase under U.S.S.G § 3B1.1 for leadership role, but rather the excess effect that his leadership role has on the two other enhancements.

The firearms enhancement under U.S.S.G. § 2A2.4(b):  This enhancement applies if a firearms "was possessed and its use was threatened." The PSR includes no evidence that Mr. Payne ever threatened anyone with use of a firearm.  Indeed, there is no evidence of threats at all. Instead, paragraph 42 recommends the 3-level increase for this specific offense characteristic based on possession alone: "Firearms were possessed in this offense, as seen in multiple videos and news conferences." Although "threatened" is not a defined term in the guidelines, certainly it is more than possession.

Mr. Payne readily acknowledges that he carried a firearm. This has long been part of his daily equipment, even before the occupation. He was not a felon, he was entitled to carry a firearm, and he did.  Mr. Payne denies that he ever threatened anyone with a firearm during the occupation. He agreed to this enhancement with the understanding that in a conspiracy, he could be held accountable for the foreseeable acts of others, which the government alleged to include threats with firearms.  On this basis, however, every other convicted person at the refuge could also have

PAGE 4.     DEFENDANT'S SENTENCING MEMORANDUM

received this enhancement. The Court recently did not impose this enhancement at the sentencing for Jason Patrick. Imposition of this enhancement in Mr. Payne's case would be based in part on his leadership role – that he was more responsible than others for the acts of others. While this may be a fair application of the relevant conduct provisions of the guidelines, it does increase the punitive effect of Mr. Payne's leadership role.[1] The Court can consider whether a variance is appropriate to offset the effect of this 3-level enhancement for possession of a firearm, on top of the 4-level leadership enhancement.

The Terrorism Enhancement Under U.S.S.G. § 3A1.4, Application note 4: The plea agreement includes a 10-level upward departure under Application Note 4 of U.S.S.G. § 3A1.4 (Terrorism). This upward departure may be applied even if the offense was not specifically enumerated as a terrorism offense under 18 U.S.C. § 2332(b) but was designed to influence the conduct of government by intimidation. The government calibrated its plea agreements to include varying levels of this upward departure for each defendant, from three to ten levels. Of the leaders, the government recommended 5 levels for Blaine Cooper, 5 for Joseph O'Shaughnessy, 7 for Brian Cavalier and 9 for Jon Ritzheimer. The recommended 10 level increase for Mr. Payne is not based on specific acts of intimidation that outweighed those of the co-defendants, but again reflects a

---

[1] Arguably, the government would have to prove that Mr. Payne *intended* that his possession of the firearm be threatening in order for the specific offense characteristic to apply. *See Elonis v. United States*, 135 S. Ct. 2001, 2008 (2015) (holding a "threat" is a "communicated intent to inflict harm or loss on another."). In *Elonis*, the Court rejected the government's argument that the law should punish statements reasonably regarded as threatening, so long as the defendant is aware of the context and content of the statement, and, instead, found that a greater mens rea is required to criminalize speech: "Having liability turn on whether a 'reasonable person' regards the communication as a threat—regardless of what the defendant thinks—'reduces culpability on the all-important element of the crime to negligence[.]'" *Id*.

PAGE 5.   DEFENDANT'S SENTENCING MEMORANDUM

greater leadership role for Mr. Payne.  The Court can consider whether this ten-level increase, on top of the other increases for leadership, would be overly punitive and warrant a variance.

        B.        *The Need to Avoid Unwarranted Disparity Among Co-Defendants.*

As the Court is aware, no co-defendant has received a sentence as high as the 41-month sentence requested by the government for Mr. Payne.  In fact, for those like Mr. Payne with no prior criminal history, the majority have received sentences of probation.[2]  Those with leadership roles have received sentences ranging from 10 months to 21 months.  Mr. Payne's requested 24-month sentence is appropriately higher than that received by co-defendants in light of his leadership role, but also reflects downward variances for specific factors in his life that are not accounted for in the government's recommendation.  These are described below in the history and characteristics of the defendant.

As a small point, it is worth noting that there is a disparity in the government's recommendation for only a 2-level downward variance for Mr. Payne's early resolution of the case by plea. Mr. Payne signed his plea agreement on July 14, 2016, one month earlier than Mr. Ritzheimer (Dockets 905, 1035).  Because the government recommended a 3-level downward variance for early resolution at Mr. Ritzheimer's sentencing (Docket 2344 p. 6), the same recommendation should be made in Mr. Payne's case, resulting in one additional level of variance. The government similarly recommended a 3-level downward variance for early resolution for

---

[2] Ehmer (366 days); Dylan Anderson (probation); Sean Anderson (probation); Sandra Anderson (probation); Kjar (probation); Blomgren (probation); LeQuieu (criminal record, 30 months); Thorn (criminal record, 18 months); Stanek (probation); Cox (probation); Flores (probation); Ritzheimer (1 year and 1 day); Cavalier (time served of 10 months); Patrick (21 months).

PAGE 6.    DEFENDANT'S SENTENCING MEMORANDUM

Brian Cavalier and Blaine Cooper, who signed their plea agreements two weeks and one week earlier than Mr. Payne, respectively (Dockets 799 and 852).

    C.    *The Nature of the Offense.*

Mr. Payne's role in this offense has not been examined through the testimony of witnesses or evidence that he could cross-examine at trial. This leaves him vulnerable to claims that are exaggerated, or wrong, or out of context, or taken from media reports that reflect inaccuracies. The defense does not dispute that Mr. Payne went to Harney County to support the Hammonds and to pursue his idea that the citizens of the states should take a stand against over-reaching by the federal government. He sought to establish a Committee of Public Safety. He wanted the local officials to recognize the petition for redress of grievances. He met with the sheriff to strongly express his view that the sheriff had an obligation to uphold the Constitution, and he told a lieutenant that the sheriff should be removed "by any means necessary" if the sheriff failed to fulfill his constitutional obligations.[3] He helped manage the unlawful occupation of the refuge, causing disruption and harm to many.

But certain things that have been suggested during the course of this case did *not* happen. Although Mr. Payne was involved in establishing a militia coordinating group called Operation Mutual Defense, this group voted not to go to Harney County to engage in support of the Hammonds. Thus, Mr. Payne went alone, not as a member of a militia coordinating committee. Some statements made by Ammon Bundy to the Sheriff seem to be attributed to Mr. Payne, such

---

[3] At trial, Lieutenant Needham recalled that Mr. Payne had said "by any means necessary, including death." FBI agent Ladd who took a report from Lt. Needham on the very day of the Lieutenant's conversation with Mr. Payne did not include this alleged death threat in his report, however.

PAGE 7.    DEFENDANT'S SENTENCING MEMORANDUM

as the comment that "extreme civil unrest" could ensue if the Hammonds were imprisoned. See PSR ¶18 (attributing this comment to Payne and Ammon Bundy). Sheriff Ward testified that Ammon Bundy was the person who explained his views on the role of the Sheriff and who said they would "bring thousands of people to town to do my job for me." (Docket 1846, Trans. Sept 14, p. 14). Sheriff Ward testified that "civil unrest" was a phrase "used when presenting ultimatums multiple times, through multiple interactions with Mr. Bundy." (*Id.*)

Ryan Payne did organize participants during the occupation into rotations of work, guard and rest duty. As he explained to the gathered people at the refuge on January 7, 2016, it was important that everyone have "something to do" because "idle hands are the devil's workshop." (Govt Trial exhibit 49). Mr. Payne has explained that there were so many idle young men with firearms that he was worried things would get out of control. He called for strict discipline. He admonished people for shooting their guns at random targets, and he helped lead the target training practice– with the help of the government informant – to prevent problems from developing.

The January 7 video recording is important for understanding the leadership that Mr. Payne exercised during the occupation. In addition to telling the assembled group that they would need to be structured into work, rest and guard rotations, he also told them that he had spoken to the Sheriff that day. He told the Sheriff that "we do not want violence" and he emphasized that to the group. He told the group they should not be mad at the sheriff or the people who worked with him, because those people were just "misinformed" based on their life experiences, and were not bad people. "I have a personal relationship with the Sheriff – he's a good man" Mr. Payne told the crowd. He wanted the group to stand up for the Constitution and for "righteousness" but he encouraged them to "love your enemy." (Govt Trial Exhibit 49).

PAGE 8.    DEFENDANT'S SENTENCING MEMORANDUM


Mr. Payne spoke in military language about tactics and strategies and guard duty, and he was valued by his peers as someone who understood tactics. He was intense and completely committed to a political ideology that advocated return of power to the people instead of the federal government. He carried a sidearm and was comfortable with weapons. All of this made him an intimidating and forceful figure. He differed significantly from many of the people who gathered at the refuge and who were co-defendants in this case, however. Mr. Payne is not anti-authoritarian or opposed to the idea of government. He is not a wiseass or a provocateur who gets pleasure from causing disorder. He is empathetic, consistently respectful, and hard-working. He reads widely and is willing to listen. As described below, he has since renounced any intention to work for political change or through militias as he had before, and hopes to focus on more direct assistance to individuals in need.

The nature of the offense has necessarily been colored by the many characters involved. Mr. Payne's previous militia involvement and his military experience affect how he is viewed by the government. Mr. Payne's role in the offense should be viewed fairly, with reference to facts and not generalizations.

### D. History and Characteristics of the Defendant.

The defense has provided two expert reports to the court along with letters of support from colleagues and family members of Mr. Payne. We also provided the PSR writer with investigator reports documenting Mr. Payne's childhood, which included significant elements of turbulence. These will be discussed during the sentencing proceeding through the testimony of Dr. Suzanne Best.

In brief, Mr. Payne joined the U.S. Army at the age of 17, directly after graduating from high school. He spent the next formative period of his life receiving indoctrination into the moral code of the military, as Dr. Brown documents in his extensive report. Mr. Payne had wanted to serve his government ever since childhood, and clearly gravitated toward the strict moral code, clear demarcations of right and wrong, and sense of purpose that the military offered. He succeeded in the military, as his many commendations and two tours of combat duty demonstrate. He later became disillusioned and felt betrayed by his commanders, after he and his unit were not supported during a life-threatening encounter, among other reasons. He came to question the use of force by the government, including the morality of killing as instructed. His life after his honorable discharge reflected the destabilizing effects of loss of purpose, questioning of previous values and actions, and lack of foundational principles. As Dr. Brown and Dr. Best both emphasized, this is not unusual for veterans who suffer a "moral injury" and do not receive treatment after discharge.

After several years of searching, Mr. Payne found endeavors that provided meaning and purpose for him. His children are a primary source of joy and purpose. As the letters document, he takes pride in being a good father and wants to provide the type of home he lacked. Mr. Payne also found religion, following his grandfather into a study and practice of Judaism. His mother also recently converted. Last, Mr. Payne found meaning in the patriot movement and political efforts to support individuals against the tyranny of the federal government. He engaged in deep reading of historic, early American documents, studying the founding fathers and their discourses on liberty. His own writing reflects this influence. He willingly joined online groups and so-called coordinating committees to discuss these ideas, and his contributions to the discussions include

inquiry into the morality of violent action against the government. The government highlighted some of these conversations in its opposition to pre-sentencing release for Mr. Payne.

After two years of reflection during his time in custody, Mr. Payne has a clearer understanding of the limitations and harms of his previous political fervor. He wants to focus on his family and on direct help to others. He will tell the Court that he does not advocate violence. That he has no desire to own guns (and knows that he cannot). And that he does not intend to engage in patriot movements or public political protests. As he writes in his letter to the Court, he accepts that "it is judicial officers, such as your Honor is, who are to be the final governmental bulwark of the Constitution, and I possess no authority to feign some 'defense' of the people from rulings I disagree with." He is chagrined that he could receive a "terrorism" enhancement at sentencing, and feels worried he is perceived as "the very enemy of the people from whom I sought to protect them formerly." He offers his sincere apology to those who were harmed by his actions or words or the reactions to them, and he apologizes to the American people for having "abused the honor you formerly endowed me with."

For each of these reasons, and as will be supported in the mitigation materials and at sentencing, a variance to a sentence of 24 months will provide a sentence sufficient but not greater than necessary to meet the goals of sentencing.

RESPECTFULLY SUBMITTED on February 21, 2018.

*/s/ Lisa Hay*
Lisa Hay
Federal Public Defender
Attorney for Ryan Payne

PAGE 11.   DEFENDANT'S SENTENCING MEMORANDUM