1          IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF OREGON

3                 PORTLAND DIVISION

4
UNITED STATES OF AMERICA,          )
5                                   )
                    Plaintiff,  )  Case No. 3:16-cr-00051-BR-4
6                                   )
              v.                    )
7                                   )  February 1, 2018
RYAN PAYNE,                         )
8                                   )
                    Defendant.  )  Portland, Oregon
9  _____)

10

11

12

13                  RELEASE HEARING

14              TRANSCRIPT OF PROCEEDINGS

15          BEFORE THE HONORABLE ANNA J. BROWN

16      UNITED STATES DISTRICT COURT SENIOR JUDGE

17

18

19

20

21

22

23

24

25

1                          APPEARANCES

2  FOR THE PLAINTIFF:
                          GEOFFREY A. BARROW
3                         U.S. Attorney's Office
                          1000 SW Third Avenue
4                         Suite 600
                          Portland, OR 97204
5

6

7                         LISA HAY
FOR THE DEFENDANT:        Office of the Public Defender
8                         101 SW Main Street
                          Suite 1700
9                         Portland, OR 97204

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                    TRANSCRIPT OF PROCEEDINGS

                       (February 1, 2018)

(In open court:)

          THE COURT:  Good morning, everyone.  Please be
seated.

     Mr. Barrow?

          MR. BARROW:  Good morning, Your Honor.
Geoffrey Barrow on behalf of the United States.  This is
United States v. Ryan Payne.  It is Case No. 16-cr-00051.  I'll
note for the record that Mr. Payne is present in the custody of
the U.S. Marshals.  He's represented by Lisa Hay, the Federal
Defender here in our district.  This is the time and place set
for a hearing on defendant's motion for release pending
sentencing.

     The government is prepared to proceed.

          THE COURT:  Thank you.  Ms. Hay, good morning.

          MS. HAY:  Good morning, Your Honor.

          THE COURT:  Let me just note I've had the chance to
review both what you filed as a motion, Docket 2445, and the
government's response, 2450.  I also have Officer Nischik's
report dated yesterday, and he and I have talked.  I just
wanted to note that his recommendation for release is focused
on the suitability of Mr. Seal's home as a release option.

     I clarified with him that he did not engage in a legal
analysis as to whether the record shows clear and convincing

1    evidence for release, but he does find suitable Mr. Seal's

2    residence in the event a release decision is -- in the event

3    that the defendant's motion is granted.  So I've got all of

4    that.

5                MS. HAY:  Thank you, Your Honor.

6                THE COURT:  What would you like to add?

7                MS. HAY:  Your Honor, I wanted to just support

8    further my motion for release in order to present the clear and

9    convincing evidence, if I could, for release.

10                THE COURT:  Yes, please.

11                MS. HAY:  I do believe Mr. Seal's residence would be

12    appropriate, and we could get to that point; but, Your Honor,

13    the factors the Court should consider, when assessing flight

14    risk or danger, all favor Mr. Payne.  They -- the ordinary

15    factors, of course, are the nature and circumstances of the

16    offense and whether it's a crime of violence.  In this case,

17    this one is not a crime of violence.  It has a maximum of six

18    years, and the government is recommending 41 months.  Mr. Payne

19    has already served 24 months.

20        The weight of the evidence against the person is one of

21    the factors the Court normally considers.  That's difficult in

22    this case, because, of course, he's pled guilty.  On one hand,

23    all the weight is against him.  But the fact that he pled

24    guilty, I think, should be considered by the Court as an

25    acceptance of responsibility.  So that's a hard one to include.

1          The history and characteristics of the person, we've

2     presented to Pretrial Services before and to the presentence

3     report writer the summaries from his military friends, from

4     close family friends, from acquaintances.  I've met with his

5     attorneys from Nevada.  Everyone attests to Mr. Payne's honor

6     and integrity.  When he says he will do something, he -- he

7     will follow his word.  He received an honorable discharge from

8     the military, and he is somebody who values honor and his word.

9     So I think, Your Honor, when he tells you he will come to

10    court, he -- he means that.

11         Your Honor, you're also supposed to consider the physical

12    and mental condition, the history of drug and alcohol abuse,

13    and Mr. Payne does not have any history of drug abuse.  He

14    doesn't have any current mental health issues.  He's a healthy

15    person.  He can be relied upon to get himself to court.  So

16    those factors also weigh in his favor.

17         Criminal history.  He had none until this offense.  That

18    weighs in his favor.  Family ties, employment, financial

19    resources, I think the residence in the community, all of

20    those, Your Honor, also favor release.  Of course his ties are

21    in Montana; but they're, nevertheless, strong ties.  He has a

22    fiancée; he has children.  His mother, his grandparents,

23    they're all in Montana.  He has a home there that had been

24    approved by Pretrial in Nevada for him to stay with his fiancée

25    there.  He has very reputable people he can stay with here in

1    Oregon too.  So the idea of a flight risk, I guess, is not --
2    it's not supported when somebody has such strong ties.  A
3    flight risk ordinarily occurs when somebody doesn't have the
4    kind of ties where you can track them down, doesn't have the
5    kind of ties where you wonder, you know, would they be somebody
6    who could be found, or would they just disappear?
7         Another factor, Your Honor, for the Court to consider is
8    the record concerning appearance at court proceedings, and
9    that's also a statutory factor.  And I think that is where the
10   42 days where Mr. Payne was on release in Nevada become
11   relevant.  He was released December 1, as you know, of 2017, on
12   home detention.  That was later modified to a curfew that
13   allowed him to be within Clark County.  And despite the
14   severity of the sentence he faced in Nevada, which was much
15   harsher than the sentence here -- he was facing a mandatory 67
16   years of custody if convicted of all the stacked charges.
17   Despite that severity, he showed up for court as required.  He
18   met with his attorney.  He came to his court appearances.  And
19   I think that's a very significant factor.  It's a statutory
20   factor, and it's one where Mr. Payne has shown himself to be
21   someone who can be relied on to turn himself back in to the
22   Court.
23        And I'll also point out he didn't engage in any violence.
24   He didn't threaten people.  He didn't -- he wasn't charged with
25   posting inflammatory statements, so -- that's one of the

1    factors also.  Risk of violence.  He was out for 42 days.  He

2    did not do anything violent.

3        He drove the 850 miles to his home in Montana, with the

4    Court's permission, and then drove 850 miles back to court,

5    still facing that potential 67-year sentence if he went to

6    trial in Nevada and was convicted.

7        Your Honor, you released Mr. Payne temporarily so that --

8    well, he was first ordered to turn himself in to the

9    U.S. Marshals if the Court in Nevada dismissed the charges with

10   prejudice.  And I know the government had a concern that in

11   that sort of possible celebration of the Bundy defendants and

12   their supporters, that there could be some kind of mayhem that

13   Mr. Payne or others might be overwhelmed by the relief and some

14   kind of misconduct could occur, and so you asked him to turn

15   himself in to the U.S. Marshals after that court ruling in

16   Nevada, and he did that.  He turned himself in to the

17   U.S. Marshals as required.

18       We then discovered that it might be difficult to have

19   Mr. Payne brought for the phone conference that this Court had

20   ordered about possible release based in -- on the Oregon case

21   now, and you may recall that we ended up -- you ended up

22   ordering the U.S. Marshals to release Mr. Payne to that home

23   detention.  And then the next day he was supposed to go to his

24   attorney's office, and we did the phone conference by phone

25   with him at his attorney's office.

1    So, again, Mr. Payne followed through with each of those.

2    So I think those examples show that when this Court orders him

3    to do something -- to go to court, to go to home detention, to

4    go to his attorney's office and be on the call -- each one of

5    those things he did despite the emotional circumstances that

6    existed at the time.

7        Your Honor, during that phone conference with the

8    U.S. Attorney's Office and Mr. Payne on the phone, the

9    government argued that he was a danger and should be taken into

10   custody by the U.S. Marshals and brought via the marshals to

11   Oregon because of this concern that he might leave and then the

12   danger would be -- could -- there could be some difficulty if

13   the marshals had to go retrieve him.

14       We had an argument for both sides, Your Honor, and you

15   agreed with my position that he should be allowed to

16   voluntarily take a commercial airline from Nevada, come to

17   Oregon, and turn himself in here.

18       Originally, we asked to have him drive here, but that

19   drive turned out to be difficult to arrange.  But you did allow

20   him to get on a commercial airlines, come here, and turn

21   himself in to Pretrial Services and the marshals, and that was

22   January 12th, and, again, he did that despite the government's

23   concern that he might flee or pose a danger.

24       So I think we do have quite a history here of Mr. Payne

25   following what this Court has told him to do, showing up in

court, and not posing danger.

I do want to acknowledge there was a violation of pretrial conditions when he met with Mr. Bundy and Mr. Ritzheimer at the Bundy ranch, and, Your Honor, that -- Mr. Payne will apologize to you for that.  I called it a miscommunication and a misunderstanding because there were some discussions about whether the co-defendants in Nevada were allowed to meet with each other without their lawyers present, and I know -- I have a copy of a -- Ryan Bundy -- not Ryan Payne.  Ryan Bundy filed a notice with the Court that they intended that they should be able to speak without their lawyers present because they had been doing that in custody, and my understanding was this was addressed on -- in the courtroom, but there is no minute order. So then --

THE COURT:  The order that was ordered in Nevada certainly didn't undermine this Court's order.  Mr. Payne was not to have contact with co-defendants unless it was in preparing his defense and with counsel present.  Going to Ammon Bundy's house to celebrate and then to Bundy ranch the next day to celebrate were violations.  They're just -- that's just the fact.  And that's the problem here.

If this was a case against Mr. Payne alone and he wasn't subject to influence by all of the supporters with whom he's associated, with all the people he's motivated to participate in these events, both at the Bundy ranch and at Malheur, that

1    would be one thing; but it's his interaction with these others

2    that is a difficult thing to assess because he -- he can't seem

3    to leave well enough alone.

4         He was in a position where Chief Judge Navarro was

5    struggling with resolving legal questions there.  He got the

6    benefit of being released because she was concerned about the

7    viability of that trial, and he certainly didn't respect the

8    situation he was in here.  So I -- I don't -- I don't think

9    there's any plausible argument here that this was a

10   miscommunication.  This was Mr. Payne choosing to do what he

11   wants to do, and that's been part of the problem in assessing

12   the viability of release for all the defendants here.

13        This notion that somebody who has a complete disrespect

14   for the rule of federal law and the function of a federal

15   court -- I mean, I'm recalling times where he interacted with

16   me in this case.  It's very hard to have confidence the times

17   he chooses to comply are not just choices he's making for his

18   own benefit and that he won't choose to do what he wishes to do

19   when especially motivated by others.

20        We saw that play out, unfortunately, with Jake Ryan in the

21   recent past.  I'm convinced that interactions with others

22   influenced him to make decisions that ended up really hurting

23   him, and the -- the role Mr. Ryan plays in -- I'm sorry,

24   Mr. Ryan Payne plays in this whole scenario as one of the

25   people who organized the Malheur occupation, one of the people

1  who was, in fact, posting very aggressive language online about
2  effectively defying a federal court order for the Hammonds to
3  surrender, and to interfere with that kind of order, it's very
4  difficult to ignore all of that in the face of some compliance
5  examples that, you know, happened at a time when coincidently
6  he anticipates he might be seeking release.  So there's a big
7  problem here to sort all of that out.
8           MS. HAY:  And, Your Honor, I -- I understand that.  I
9  think Mr. Payne would like to address the Court, and I think he
10 will tell you that he has changed from what he used to say,
11 especially the government's, you know, 2014 quotes from four
12 years ago.  I think he'll tell you that he has learned a great
13 deal while in custody and that he respects the authority of the
14 Court and will follow the Court's orders.  I don't think that
15 he should be held as accountable for some of these things said
16 a long time ago.
17      This isn't the time to address this most likely, but I do
18 have some concerns about those 2014 quotes that they have,
19 recorded statements of Mr. Payne, that is in the government's
20 motion.  And my concern is this:  Is that I -- there are other
21 voices on those recordings.  It's not something Mr. Payne --
22           THE COURT:  Ms. Hay, I presided at the trial at which
23 the sheriff testified about a very aggressive presentation with
24 which your client was involved at the sheriff's office over
25 this Hammond situation, so it's not an isolated statement that

1  cut -- could have been by somebody else.  Mr. Payne was very

2  active in organizing this terrible situation at the Malheur

3  Refuge, including the entire militia focus, the firearms focus.

4  So I don't have any doubt that those singular statements that

5  Mr. Barrow cited are not representative of what he was saying

6  then.  That was part of the problem, and that was part of the

7  basis for his finding of guilt that I made based on his plea of

8  guilty.

9         MS. HAY:  And, Your Honor, I wasn't intending to say

10 that Mr. Payne wasn't making the statements.  What my point is

11 is there are other people that are on these calls who are also

12 saying inflammatory things.

13        THE COURT:  That's my point to you.

14        MS. HAY:  But I --

15        THE COURT:  It seems that when he's engaged with

16 other people who have this attitude of disrespect and defiance

17 for federal law, he's at a particular risk to make very bad

18 decisions.  This is not an isolated case where a defendant is

19 charged with -- now convicted of -- a serious felony crime,

20 conspiracy to impede an officer of the United States by force,

21 threat, or intimidation, and has a few examples of compliance

22 at its -- with release conditions and violation of release

23 conditions at a time when he should be especially focused on

24 the need to assure the Court that whatever his beliefs are,

25 he's going to comply.

1    I -- I don't have that confidence here because of the

2  context.

3           MS. HAY:  So I -- I can't -- I'm not disputing any of

4  those statements, Your Honor.  My point about the phone calls

5  was I'm concerned that there's government agents who were on

6  those calls as well, and I've asked Mr. Barrow to help confirm

7  for me whether there are --

8           THE COURT:  You can sort out the phone calls.  I'm

9  relying, for example, specifically on the sheriff's testimony

10 about your client's behavior in his office and the degree of

11 intimidation he sought to impose on the sheriff for the purpose

12 of what?  Interfering with a federal court sentence that had

13 required the Hammonds to surrender after an appeal.  It wasn't

14 merely a district judge's sentencing order.  It was a matter

15 that had been reviewed by a court of appeals, leaving the

16 district judge no choice but to impose the mandatory minimums;

17 and, yet, your client confronted the sheriff and insisted the

18 sheriff was supposed to protect the Hammonds from a lawful

19 sentence, one that had been reviewed and remanded back to the

20 Court for action.

21    That's enough evidence for me that these references to his

22 statements about doing what it takes to achieve his goal,

23 whatever that may be, is a very deep-seated belief that he has,

24 and that's something that's hard to refute from the current

25 state of the case.  And it's very hard to come to an honest

1  conclusion that there's clear and convincing evidence that if

2  he chooses to change his mind, that we won't have more of the

3  same.

4        That's my primary concern here.

5             MS. HAY:  And, Your Honor, I -- I read the trial

6  testimony, so I understand exactly what your concern about the

7  interaction with Sheriff Ward is.  I guess what I can say is I

8  know Mr. Payne had what I would consider a misguided view of

9  the government's authority and the way to respond to that.  I

10  know he will tell you that he didn't understand his -- the

11  context then to be as intimidating as it now turns out the

12  sheriff felt it was.  The sheriff, I do believe, testified he

13  was trying to be accommodating, conciliatory, and that he later

14  would meet with them and still try to deescalate, and so I

15  think --

16             THE COURT:  This meeting was simply one example --

17             MS. HAY:  Right.

18             THE COURT:  -- of really irrefutable evidence of your

19  client's disrespect for the order of a federal court.  He was

20  part of a group that attested that they would do anything they

21  could to interfere with an order because they believed the

22  Hammonds were being treated unfairly.

23        Just because they believe that doesn't mean they can't --

24  that they have the right to interfere with a court order.

25  That's just a fundamental premise.  Trust that a person will

1    comply is at the heart of this burden he has today.  And maybe
2    he has had a change of heart, but the problem is I still have
3    to evaluate it in the context of the crime for which he's going
4    to be sentenced.
5              MS. HAY:  And, Your Honor, maybe this would be the
6    right time for Mr. Payne to speak to the Court.  I know he did
7    want to address you, and I think he pled guilty to what
8    happened in --
9              THE COURT:  He also sought to withdraw his plea.
10              MS. HAY:  Your Honor, I know that the timing there
11   isn't always -- isn't completely clear; but he -- we filed a
12   motion to withdraw before there was a verdict in that case, and
13   I think you're aware that the -- the plea in Oregon had been
14   tied to a potential plea in Nevada, which obviously fell
15   through.  So there's more complications there.
16        I think, in any event, we can address that, as well, at
17   the sentencing.  But he did plead guilty to what happened here,
18   and I think he wants to tell the Court that he understands
19   things differently than he did back in -- in the earlier days
20   when he was making statements, and I -- I do believe he would
21   be reliable to come to court, and that the evidence that we do
22   have with his compliance with coming into court and his lack of
23   danger to anybody is still clear and convincing.
24        The violation that occurred isn't an example of flight
25   risk or danger, which is the standard the Court should apply

1    here.  So if we're looking at did he do things wrong, then of

2    course he could be kept in custody for having done things

3    wrong.  And he's pled guilty, so he could be kept in custody.

4    That's not the standard.  The standard is is he a danger to

5    anybody and is he a flight risk?  And I think on those two we

6    do have clear and convincing evidence.

7        Let me ask if Mr. Payne could speak.

8            THE COURT:  If he would like to speak with you first,

9    that's fine too.

10        Mr. Payne, good morning.

11            THE DEFENDANT:  Good morning, Your Honor.

12        Sorry.  I respect the Court's time and hope to be brief.

13    I -- first off, hearing -- hearing Your Honor's concerns, I

14    agree with your assessment that my interaction with certain

15    individuals is probably a -- somewhat of an influence on my

16    decision-making, and, in light of that and my desire to repent

17    of the deeds for which I have pled guilty, notwithstanding

18    my -- my previous attempt to withdraw the plea, I do intend

19    to -- to abide by the Court's, you know, not allowing that to

20    happen and -- and to move forward with the sentencing and abide

21    by whatever sentence the Court finds to be appropriate.

22        And in regards to a release until that sentencing and

23    until I serve whatever sentence it is that the Court imposes, I

24    believe that it would be in my -- in my best interest and, of

25    course, satisfy the Court's concerns that I abide by the

1    restriction not to affiliate with these people and even not

2    specifically in regards to the Court's restriction, I agree

3    with the Court's concern.  I would take it upon myself, I

4    think, to impose that restriction on myself.  So I -- there's a

5    similar interest I have there.

6        The reason for that, Your Honor, is that I feel -- I

7    understand that in the Court's perception and certainly

8    possibly in the government's perception and maybe even in the

9    American people's perception, my honor and service to my

10    country is slightly marred due to my actions; but one thing I

11    don't want to be marred is my integrity, and I understand the

12    concern with the previous -- what Ms. Hay has characterized as

13    a misconception or -- I'm not going to argue that with you.  I

14    accept responsibility for that and -- and am deserving of that

15    admonishment.

16        So I do have a desire to spend a little bit of time -- I

17    do appreciate the Court's allowing me to return home and spend

18    some time with my children and my fiancée during -- over the

19    holidays.  I -- I am requesting the Court's mercy in allowing

20    that so that I can spend a little bit more time with them

21    before this sentencing occurs and with my word given that I

22    will do my utmost to abide by the Court's orders.  I do respect

23    the Court's orders, and, once again, my apologies for the

24    previous inequity in that regard.

25        That's all I have.  Thank you, Your Honor.

1          THE COURT:  Thank you, Mr. Payne.

2      Mr. Barrow, anything?

3          MR. BARROW:  Your Honor, I'm not one to recount the

4  arguments that we present in our written briefing.  I just

5  would like to react to what Mr. Payne just said.  I certainly

6  respect and appreciate his words promising compliance, but the

7  problem is a little more than a month ago he was released with

8  a similar promise to abide by conditions and he violated those

9  conditions.

10     I would also note that his request to be released to spend

11 time with his fiancée and his children and to prepare for

12 self-surrender, as articulated in Ms. Hay's briefing, those are

13 not factors that the Court should consider under the statute.

14     And, finally, while I have great respect for Pretrial

15 Services, and Mr. Nischik in particular -- he's done a

16 tremendous amount of work in this case.  I've talked to him

17 about all the defendants, and I know they have been difficult

18 to supervise.  But the bottom line is that if Mr. Payne is

19 released in this case and he eventually decides to act on the

20 words that he said on so many prior occasions, or even if those

21 that Mr. Payne has inspired over the long period of time act on

22 the words that he has said and choose to not abide by the

23 surrender order, or if his friends take him into custody, as he

24 proposed for the Hammonds, deputy U.S. Marshals will be asked

25 to go and find Mr. Payne.  And given the defendant's past words

and his actions, that's not something that anyone should ask them to do.

The bottom line is that Ryan Payne should be detained pending sentencing, which is currently set for February 27th, because he is a danger to the community and a risk of flight.

I'm happy to answer any questions the Court may have.

THE COURT:  No.  Thank you, Mr. Barrow.

Is there anything else, Ms. Hay?

MS. HAY:  Your Honor, I guess just that's the argument the government also made when we were considering how Mr. Payne should get from Nevada to Oregon, and I think if there were a moment that somebody would take off and, you know, be influenced by the wrong people, that was probably the moment in Nevada when the case had been dismissed, when there were many Bundy supporters around, when he actually had to get himself to the airport, get on the plane, knowing he's coming here to go into custody.  Because that was clear.  He was coming straight to custody, and we didn't have a release hearing set for several weeks, which we had to postpone until now.

So I know the government's concern, but I have known Mr. Payne now for two years.  I have been in contact with him on the phone.  I've talked to his lawyer who has been working with him in Nevada.  He's not somebody who has been spouting violent statements during this whole case.  I think he has

1    actually learned a great deal of how his conduct was perceived

2    by others and that if he even at that point had a good faith

3    belief in his political viewpoint, that he's gone in a

4    different direction from that and he knows he can't follow that

5    anymore.  And I -- I don't think what the government has said

6    shows a danger and a flight risk.  I think our burden is to

7    show clear and convincing evidence that he is not a danger or a

8    flight risk, and I feel that all the factors that the Court

9    should consider, those do weigh in his favor because of his

10    lack of a criminal record, his connections to the community,

11    his lack of drug addiction, his appearances in court.

12        The government is coming up with ideas of how he could be

13    a danger, but they haven't actually proven true.  And I

14    understand that the statements that he made were inflammatory

15    and the interaction with the sheriff was intimidating, but in

16    all of this, there's actually not an allegation that he pointed

17    a gun at somebody, that he was threatening that he was actually

18    going to harm somebody.

19        I know there was one statement that -- supposedly a

20    statement that -- to do anything up to the point of death.   I

21    think you'll recall that the FBI agent who was called that same

22    day to testify said he -- he got the report from

23    Lieutenant Needham, and he didn't include any death threat in

24    his report.

25        So I think there are some memories that have been affected

by time; but, nevertheless, I know Mr. Payne has agreed that his actions were intimidating, that he understands now that the way he behaved and the words that he used are what made the Court question him. And, yet, time has passed since then. And in his time out on release, he did actually come to court as he was supposed to. He didn't threaten anyone. He didn't do what the government's concern was, was that he would hold himself up somewhere and have to be extracted. He could have done that during any one of the 42 days he was out on release. He could have done that when the Court ordered him he had to come to Oregon to go into custody.

So I think the government is putting forward suppositions of what could happen, and we've put forward evidence of what actually did happen. And actions, in the end, speak louder than words.

So I'm asking the Court to release him because the statute allows it. We presented evidence that would show that he's not a clear danger. In fact, there's clear and convincing evidence that he's not likely to pose a danger or a flight risk. I think if he is released to Mr. Seal's home, he will be on a monitor and come as required.

As you know, having somebody released pretrial or presentence does make a difference on their custody classification, their time where they may be sentenced or where they may be sent. If the Court were willing, after sentencing,

1    to allow some time before self-surrender, of course it means

2    the defendant doesn't have to stay in county jail and get moved

3    to Oklahoma.  So there are practical reasons in addition to

4    request this, but we are intending to go forward with the

5    sentencing on February 27th.  We're not seeking delay of that.

6         So our request is that until that time he be released

7    because the statute would allow it.

8         Thank you, Your Honor.

9              THE COURT:  Thank you, Ms. Hay.  Give me a few

10   minutes here, please.

11                  (Pause-in-proceedings.)

12             THE COURT:  Let me begin by addressing the point

13   Ms. Hay has made a few times that the Court's decision in

14   allowing Mr. Payne to travel out of custody from Nevada to

15   Portland, knowing he would have to surrender to custody here,

16   somehow binds the Court in making a consistent decision today.

17   The fact of the matter is my decision to authorize that mode of

18   travel was governed by a primary concern that I needed to get

19   Mr. Payne back here and the logistical obstacles to get that

20   accomplished within a reasonable period of time were mounting,

21   including Mr. Payne's objections to being taken into custody

22   and potentially waiting a matter of weeks for when the marshals

23   might be able to coordinate a trip from Las Vegas to Portland

24   or the cost to the U.S. Marshals Service of doing some kind of

25   direct transport of him.  The priority to me was to get him

1   here because the pendency of that Nevada case has impeded the

2   resolution of this case against Mr. Payne in Oregon.  And I

3   don't in any way think that that decision -- case management

4   decision in the exercise of discretion, to move him here so

5   that we can finally get his case completed, really bears on

6   today's decision.

7        The statutory burden Mr. Payne faces is to establish

8   release as warranted by clear and convincing evidence.  Clear

9   and convincing evidence is evidence that shows the proposition

10  is highly probably, not just possible or even more probably

11  true than not.

12       This is a complicated question in Mr. Payne's case

13  because -- because of all that is documented in his behavior,

14  both at the Bunkerville event and here in Oregon, involving the

15  Malheur occupation, and his very active role here, which was

16  inextricably intertwined with a fundamental disrespect of

17  orders of this Court.  Another judge of the court, but still a

18  judge of the United States District Court.

19       I respect his statements today, and I believe his

20  assertions of integrity.  The difficulty is that for Mr. Payne

21  complying with his integrity means making decisions consistent

22  with what he thinks is right, which might coincide with a

23  Court's order or might not.  He is a man who gave service to

24  his country.  He has in his history and characteristics -- that

25  factor will weigh significantly in the Court's exercise of

1   discretion as to what a reasonable sentence will be for him,

2   but he has used that history, as well, in the

3   militia-organizing activities in which he's engaged in,

4   activities that put a lot of people at risk over time.  In many

5   ways, I think, in hindsight it's -- it's extraordinarily

6   fortunate that there wasn't more that came out of the refuge

7   than the death of Mr. Finicum, that people weren't

8   affirmatively injured or hurt beyond what had -- was documented

9   in the context of that traffic stop, at which Mr. Payne, by the

10  way, did walk out of the vehicle and surrender, as opposed to

11  the behavior of others.

12      So we come to the fundamental burden that he has for

13  purposes of release, and that is to show it is highly probable

14  that he will comply with court orders and, thus, not be a

15  danger to the community and, thus, not be a flight risk.  And

16  the difficulty I have with that is that he's even recently

17  demonstrated his -- and acknowledged here today his tendency to

18  be influenced by others who are part of this belief system

19  around which he has invested so much time and energy, to the

20  detriment of respect for the law.  So there isn't any way I can

21  look at this record and conclude that he's established the

22  standard necessary for release.  So I'm denying defendant's

23  motion for failure to meet the required burden.  He's to stay

24  in custody for sentencing.

25      At sentencing, Ms. Hay, I would like input about whether a

brief release after sentencing, in the course of a day -- I've
done this in some other cases where I was convinced it might
actually make a difference -- but a release and then a
surrender back the same day might serve to give the defendant
credit for a self-surrender that would otherwise be denied him
in the classification.

I would like both sides to address whether that is a
meaningful consideration.  If it isn't, then fine; but I have
had cases where that happened to make a difference.  I don't
know whether the nature of this offense, even though it's not a
crime of violence, as that term of art is used, the nature of
the offense, however, involves an element of force, threat, or
intimidation as the objective of the conspiracy, and I don't
know how the Bureau of Prisons will classify Mr. Payne for
purposes of a designation to a facility, which question should
not assume that I've made up my mind about what sentence I'm
going to impose and that Mr. Payne will receive a sentence that
requires more than time served.  I know that's an argument that
is coming, and I'm certainly open for that argument.

So just a reminder, Mr. Payne, when you pled guilty, I
told you the -- the decision for your sentence depends upon my
determining what sentence is reasonable.  In lay terms, that's
defined as enough but not too much and never more than the
maximum, which here is six years, to accomplish a number of
goals.  One is to punish you for criminal behavior; the other

is to promote respect for the law in you and in others
similarly situated to the point that you're discouraged from
repeating this behavior in the future and that others who see
what happened to you for having committed the crime don't do it
in the first place and a sentence that protects the community
and a sentence that looks forward to your return to the
community, taking into account your personal history and
characteristics.  And that definitely includes the good in your
background, your military service, your honor -- honorable
discharge, and other positive factors in balance with all of
the other stuff that led to this situation.

     I'm required to calculate a guideline range.  You'll
recall in your plea agreement there were agreements made
between you and the government about how the guidelines
applied.  That is between you and the government.  I still have
to make my own calculation.  And that guideline range is only a
starting point.

     It presently, as I understand it -- I haven't made any
findings, but I'm remembering that the current guideline range
presently is more than the time you've already been in custody.
But that is only a starting point.  I have discretion to
sentence you within the range, above the range, or below the
range.  But I have to be satisfied that the sentence is, in
fact, reasonable and avoids what is called unwarranted or
unjustified differences with other defendants similarly

1  situated.

2      So there's a lot to talk about around the sentencing

3  issue.  And Ms. Hay knows well how to get the information she

4  wants me to have, as does the government, into the sentencing

5  materials that I'll be receiving.

6      So the fact that I've decided you need to stay in custody

7  today doesn't at all affect what the sentence is.  That's a

8  different legal inquiry, and it will be decided along the lines

9  I've indicated.

10     So a presentence report was prepared.  There's a process

11 to object to the contents to the writer of the report.  If

12 there are issues that still remain about the content of the

13 report when we gather for sentencing, then I have to make legal

14 rulings about that.  Then I'll hear from the government as to

15 what its recommendation is and you and Ms. Hay as to yours; but

16 I won't make a final decision until you have had a chance to

17 speak directly, if you wish, at sentencing.

18     There are some guideline issues that maybe are disputed

19 here.  And one of the issues is whether the -- from my

20 perspective, is whether the fact that you moved to withdraw

21 your guilty plea affects the credit you otherwise would have

22 gotten under the plea agreement for acceptance of

23 responsibility.

24     The government may urge not to change, but I still have to

25 take that into account.  And then there's this guideline issue

1   around an upward adjustment based on the nature of the conduct

2   that is unique to this kind of charge.

3        So there's a lot to work through, and I think -- I hope

4   you know you have a very capable lawyer who understands the

5   full parameters of things.  You need to work with Ms. Hay to be

6   sure she understands what is important to get in front of me,

7   and we'll work through it and get to a sentence on

8   February 27th.

9        Mr. Barrow, anything else for today?

10            MR. BARROW:  No, Your Honor.  Thank you.

11            THE COURT:  Ms. Hay?

12            MS. HAY:  No.  Thank you.

13            THE COURT:  All right.  We're in recess.  Thank you.

14                     (Hearing concluded.)

15

16

17

18

19

20

21

22

23

24

25

1                        C E R T I F I C A T E

2

3            United States of America v. Ryan Payne

4                        3:16-cr-00051-BR-4

5                          RELEASE HEARING

6                          February 1, 2018

7

8              I certify, by signing below, that the foregoing is a

9      true and correct transcript of the record, taken by

10     stenographic means, of the proceedings in the above-entitled

11     cause.  A transcript without an original signature, conformed

12     signature, or digitally signed signature is not certified.

13

14     /s/Jill L. Jessup, CSR, RMR, RDR, CRR, CRC
       _____
15
       Official Court Reporter      Signature Date: 4/20/18
16     Oregon CSR No. 98-0346        CSR Expiration Date:  9/30/20

17

18

19

20

21

22

23

24

25