1                IN THE UNITED STATES DISTRICT COURT

2                   FOR THE DISTRICT OF OREGON

3                       PORTLAND DIVISION

4
UNITED STATES OF AMERICA,        )
5                                )
                    Plaintiff,   )  Case No. 3:16-cr-00051-BR-4
6                                )
                  v.             )
7                                )  February 27, 2018
RYAN PAYNE,                      )
8                                )
                    Defendant.   )  Portland, Oregon
9    _____)

10

11

12

13                          SENTENCING

14                  TRANSCRIPT OF PROCEEDINGS

15             BEFORE THE HONORABLE ANNA J. BROWN

16          UNITED STATES DISTRICT COURT SENIOR JUDGE

17

18

19

20

21

22

23

24

25

1                          APPEARANCES

2    FOR THE PLAINTIFF:
                              GEOFFREY A. BARROW
3                             U.S. Attorney's Office
                              1000 SW Third Avenue
4                             Suite 600
                              Portland, OR 97204
5


6
     FOR THE DEFENDANT:
7                             LISA HAY
                              Office of the Public Defender
8                             101 SW Main Street
                              Suite 1700
9                             Portland, OR 97204

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                                    INDEX

2    WITNESSES:                                            PAGE:

3    DR. SUZANNE BEST

4    Direct Examination by Ms. Hay                            6

5    Cross-Examination by Mr. Barrow                         20

6    Redirect Examination by Ms. Hay                         25

7    ROBERT WEBB

8    Direct Examination by Ms. Hay                           29

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    TRANSCRIPT OF PROCEEDINGS

2                       (February 27, 2018)

3  (In open court:)

4           THE COURT:  Good morning, everyone.   Please be

5  seated.

6      Mr. Barrow?

7           MR. BARROW:  Good afternoon, Your Honor.

8  Geoffrey Barrow and Ethan Knight on behalf of the United

9  States.   This is United States v. Ryan Payne.   It is

10 Case No. 16-cr-00051-04.   Mr. Payne is present.   He's in the

11 custody of the U.S. Marshals.   He's represented by Lisa Hay,

12 and this is the time and place set for sentencing.   The

13 government is prepared to proceed.

14           THE COURT:  Does the government have any evidentiary

15 presentations to make this morning?

16           MR. BARROW:  No, Your Honor.

17           THE COURT:  All right.   Ms. Hay, good morning.

18           MS. HAY:  Good morning, Your Honor.

19           THE COURT:  Do you have evidentiary presentations?

20           MS. HAY:  I do, Your Honor.   I wanted to call two

21 witnesses.   One is Dr. Suzanne Best, and then the second will

22 just be a witness by phone, one of the gentlemen who wrote a

23 letter in support of Mr. Payne, Robert Webb, and I've given the

24 clerk that phone number.

25           THE COURT:  Okay.   Well, let's get the new evidence

1    in first, and then we'll proceed with the sentencing.

2         I wanted to give notice, Ms. Hay, that I'm considering a

3    reduction in the acceptance of responsibility credit from the

4    three levels referenced in the government's memo and the plea

5    agreement to two because of the defendant's motion to withdraw

6    his guilty plea and his pretrial violations.

7         I'm also going to want the government to respond to each

8    of the guidelines arguments Ms. Hay has laid out and whether in

9    the context of a plea agreement those arguments are something

10   the Court should be considering since there was an agreement as

11   to guidelines.  So I want the precise position that the parties

12   have on those issues.

13        And then, finally, with respect to recommended conditions

14   of supervision, there's a no-contact recommendation with

15   respect to co-defendants, but I want you to know that I'm

16   considering expanding that to the Operation Mutual Defense

17   group identified in the government's exhibit and will want to

18   know if there are any other individuals that should be

19   considered for no-contact requirements during supervised

20   release.

21        So with that said, Ms. Hay, go ahead and call your first

22   witness, Dr. Best, and then we'll take the witness by phone.

23              MS. HAY:  Thank you, Your Honor.  Dr. Suzanne Best.

24              DEPUTY COURTROOM CLERK:  And please approach the

25   witness stand.

Best - D

1          MS. HAY:  Your Honor, may I have one moment to check

2   with my investigator?

3          THE COURT:  Of course.

4      Please come all the way up.  Watch your step.  Face the

5   deputy and raise your right hand to be sworn.

6

7                      DR. SUZANNE BEST,

8   called as a witness in behalf of the Defendant, being first

9   duly sworn, is examined and testified as follows:

10

11         DEPUTY COURTROOM CLERK:  Please be seated.  And if

12  you would state your full name, spelling both first and last

13  for the record.

14         THE WITNESS:  Suzanne Best.  S-u-z-a-n-n-e.  B-e-s-t.

15         THE COURT:  Thank you.

16      Counsel?

17

18                    DIRECT EXAMINATION

19  BY MS. HAY:

20  Q.   Good morning, Dr. Best.

21  A.   Good morning.

22  Q.   Would you just state for the record, please, your degree

23  and what your license is in.

24  A.   I have a doctorate, a Ph.D. in clinical psychology, and

25  I'm licensed in the state of Washington and the state of

Best - D

1   Oregon.

2   Q.    And what is your current practice?

3   A.    Currently, I'm in private practice, and approximately

4   30 percent of my practice is spent in treatment, and that is

5   almost entirely focused on veterans, active military, as well

6   as law enforcement professionals.  And then approximately

7   70 percent of my practice is focused on forensic work, both

8   civil and criminal, and then I do a bit of teaching and writing

9   and research.

10   Q.    And you're a clinical psychologist?

11   A.    Yes, I am.

12   Q.    Okay.  And then did we ask you to meet with my client,

13   Mr. Payne, at the beginning of this case?

14   A.    Yes.

15   Q.    And that would have been shortly after his arrest in March

16   of 2016?

17   A.    Correct.

18   Q.    And where -- where did you interview him?

19   A.    While he was in custody.

20   Q.    And could you just go through for us, please, what you

21   reviewed, before or after the interview, of information?

22   A.    Yes.  I reviewed records pertaining to the case.  I would

23   have to look at my report to know exactly what I reviewed.  But

24   I did that, and then -- so there were some witness interviews

25   that I reviewed, as well as the indictments, and then VA

Best - D

1   medical records that I had received for review.

2   Q.   And by "VA" you mean "Veterans Affairs"?

3   A.   That's correct, yes.

4   Q.   And then you wrote reports that the courts and the

5   government now have a copy of?

6   A.   Well, I conducted an evaluation of Mr. Payne, so that

7   included an extensive history collection, and then I did some

8   more semi-structured formal testing to assess his symptoms and

9   possible diagnoses.

10  Q.   And then did you have an opportunity to meet him again

11  more recently?

12  A.   Yes.   On February 13th.

13  Q.   February 13th of this year?

14  A.   Yes.   That's correct.

15  Q.   And that was, again, in custody?

16  A.   Yes.

17  Q.   So let me just jump straight to the discussion of having

18  met Mr. Payne recently.   Was there any difference that you

19  detected between having evaluated him two years ago and then

20  the Ryan Payne you met recently?

21  A.   Yes.   I would say a significant difference.

22  Q.   And could you give us sort of the overall general -- the

23  area of difference?

24  A.   Well, it was apparent that over the course of the previous

25  two years he had spent a great deal of time in introspection,

Best - D

1    which is sort of his style and character to be very

2    introspective, and so he really made use of that time

3    considering all the different aspects of his actions and his

4    beliefs and his goals.

5    Q.    So did he -- did he talk to you about a mental shift of

6    how he -- how he wants to direct his efforts going forward now?

7    A.    Yes, he did.  And that covered a few different areas.  I'm

8    sorry.

9    Q.    So could you just describe some of those, the differences,

10   that you saw in his direction?

11   A.    Yes.  So to begin with, he was very clear that --

12   especially after all this time away from his children and his

13   family, that it was very important to him to now be as close to

14   home as possible and to really focus his efforts and his

15   primary focus upon his children and his family members, and

16   that was in contrast to prior, when he was traveling about the

17   country in his activities.

18        So there was that piece.

19        Then there was also the piece in regards to his actions,

20   particularly in regards to this case and Malheur, in that he

21   really expressed a great deal of understanding about his sense

22   of -- his level of responsibility in those activities, as well

23   as the impact that his actions had, and he expressed some

24   significant remorse for that as well.

25        And then the third piece had more to do with his goals for

Best - D

1    the future and where he wants to direct his activities in the

2    future.

3    Q.    So maybe I'll turn to that in a moment, then.

4    A.    Sure.

5    Q.    Now, one of the things you discussed with him, of course,

6    would have been his military service and the effect his

7    military service had on him.

8    A.    Yes.

9    Q.    We have given the Court evidence that he served two tours

10   of combat duty in Iraq, that he joined the military at the age

11   of 17.

12        Can you discuss with us just what you saw, meeting with

13   Mr. Payne, about the effect of the military on him?  This would

14   be from his initial interview and going forward.

15   A.    Okay.  Well, especially in the initial interview,

16   Mr. Payne was reticent to discuss the specifics of the

17   experiences he had there.  Though, it was clear that, you know,

18   he entered the military at a very young age, at age 17, and he

19   was very idealistic about what his experience would be there.

20        He was then deployed to Iraq, and he discussed his

21   experiences in Iraq more broadly, in regards to the impact that

22   he and his fellow soldiers had in the country, in general, upon

23   Iraqi citizens, the part that he played in terms of essentially

24   being engaged in killing Iraqi combatants, and also the life

25   threat that was very significant that he himself experienced.

                              Best - D

1    And then he discussed some very specific incidents in that

2    regard as well.

3    Q.   So having, sort of, reviewed with him his military

4    experiences and then seeing some of the records, you discuss in

5    your report the ideas of betrayal, trauma, and moral injury.

6    A.   Yes.

7    Q.   Can you elaborate a little on what those mean in the

8    context of Mr. Payne's experience?

9    A.   Yes.  So the idea of moral injury really has to do with

10   experiencing an actual shift or something that occurs that

11   causes you to bring into question your sense of self and your

12   sense of your own moral values and beliefs and also your sense

13   of the institutions and, for instance, the government and

14   things that you depend upon and what your values and beliefs

15   are in regards to them and your relationship with them.

16       And so in Ryan's case, he suffered significant moral

17   injury that he discussed even further in our visit on

18   February 13th, which is, for one, his sense of himself and that

19   he really went into this experience thinking that they were

20   going to be in this country to protect and defend the Iraqi

21   citizens and also to promote some positive, and, in the end, he

22   came out of it feeling as though he was a trained killer who

23   was sent in to do just that.

24       So that really was a difficult thing for him.  And when he

25   returned home, his family discussed -- he reported to me, and I

Best - D

1    also saw in their interviews and letters how Ryan really

2    refused to talk about his experiences and talked about it as

3    though, "You would not feel good about who I am, and I don't

4    really want to talk about that part of me."

5         So that was a very difficult for him -- thing for him, and

6    there is now a lot of evidence and research regarding moral

7    injuries; particularly, in veterans who actually kill in

8    combat.  And the interesting thing is we think of that --

9    that's what soldiers go over there to do; but actually only a

10   small percent of soldiers actually committed that act while

11   they're in combat, and so the impact of that can be very

12   injurious to someone in terms of their sense of themselves,

13   which is true for Ryan.

14   Q.    Is it now understood that it would be helpful to veterans

15   who've experienced these kinds of incidents to get counseling

16   and to decommission any assistance as they leave the military?

17   A.    Absolutely.  Yes.

18   Q.    Is that something that's available through the Veterans

19   services even today?

20   A.    Yes, it is.  Yes.  Again, based on this research.  Uh-huh.

21   Q.    You also diagnosed Mr. Payne with having PTSD as a result

22   of all these experiences, and, I guess, before I ask you what

23   that could result in, can you help us understand if there are

24   even aspects of Mr. Payne's childhood that could have caused

25   him to be at risk for PTSD even before he entered the military?

Best - D

1   A.    Yes.   So, unfortunately, Ryan has a history that, you

2   know, he -- he really suffered a great deal of emotional abuse

3   by his stepfather.   He witnessed the emotional abuse

4   perpetrated upon his mother, as well as physical abuse, and

5   that, we know, tends to cause people to be at much greater risk

6   for developing PTSD down the road if they're exposed to future

7   trauma.   So that was the case for Ryan.

8        I think it's also important to note that the other thing I

9   discussed in my report was this issue of betrayal trauma.   And

10  that is something that Ryan experienced as a child.   Betrayal

11  trauma, being that when the either institutions or people on

12  whom you depend, if they harm or betray you in some way, that

13  can constitute a trauma because you're dependent upon them for

14  support, if not survival.   And this was the case for Ryan as he

15  was growing up with his stepfather, and his stepfather not only

16  was tearing him down and abusive, but he was also tearing down

17  the mother who brought him into the world.   And then that set

18  him up for when he went into the military.

19       He really, I think, in my opinion, was hoping to find in

20  the military and in his government the father figure that he

21  didn't have and that sense of structure and dependability.

22       And then he was involved in an incident in Iraq during his

23  second tour when he had that very significant sense of betrayal

24  in that he and a few other troops were left out in the middle

25  of the desert for over 24 hours under constant fire, and his

Best - D

1    superiors knew they were out there and refused to come and get

2    them immediately.  And so that, for him, was the sense of, "We

3    were simply left out there to die and betrayed."

4         So I'm saying all of that because all of this leads into

5    the PTSD.  The moral injury, the sense of guilt that he

6    experienced, and also the betrayal, and then also the life

7    threat, all of which led to that development of PTSD.

8    Q.   So looking at the facts of Mr. Payne's life after his

9    honorable discharge from the military, could you see the

10   effects in his life of this betrayal trauma, moral injury, and

11   PTSD when you were reviewing the interview memos and having

12   interviewed him?

13   A.   Yes.

14   Q.   What, generally, did you see about the period of his life

15   after he was discharged from the military?

16   A.   Well, initially, he struggled a great deal and -- in his

17   first marriage, and he really spoke about -- has spoken about

18   feeling an extreme sense of guilt during that time, which,

19   essentially, he tried to drown out with alcohol, initially, and

20   also just with incessant activity that wasn't necessarily

21   accomplishing much; but he was just constantly needing to be

22   active to avoid thinking about these things.  That resulted in

23   basically the dissolving of his first marriage.

24        And following that, there was a great deal of still a lot

25   of anger, which is commonly seen in people who suffer these

Best - D

1    moral injuries and betrayal trauma, and also at the same time a

2    great deal of searching.  Searching in terms of religion,

3    searching in terms of trying to find groups where he felt a

4    sense of belonging, and also just searching for some sort of

5    sense of rule and order, which is common for people who have

6    these conditions.

7    Q.    And you're aware that Mr. Payne, after that period of

8    initial few years after discharging from the military, began to

9    follow the militia movement and, sort of, group of people who

10   were thinking they were supporting the Constitution in a

11   certain way.  Does his participation in that movement make

12   sense in the context of what he had experienced and what -- in

13   his searching?

14   A.    It does.  It does.  I mean, keeping in mind that he was at

15   a relatively young age, initially, as well, and just -- just

16   that sense of what is -- what does this all mean?  Who am I?

17   Needing to find an identity was, I think, part of it.  That's

18   also a struggle.  "If I'm no longer a service member, what am

19   I?"

20        And then it was also a sense of needing something really

21   concrete.  With all this questioning and struggling going on,

22   "What can I latch onto that is a concrete foundation?"  And,

23   really, I -- it's -- in my opinion, it was really the

24   Constitution and, in addition to that, I would say the Bible

25   and religion.  That had a very concrete meaning, a concrete set

Best - D

1  of rules that was very clear, and he approached it, as did this

2  movement, in a very unquestioning way.

3  Q.    Did Mr. Payne have any reflections on his involvement with

4  these groups when he talked to you more recently?

5  A.    Yes.

6  Q.    What was his reaction to his participation in these groups

7  when you spoke this time?

8  A.    Well, if you don't mind, I would say that Mr. -- Mr. Payne

9  tends to be more eloquent than I am; so if I could just read

10 some of what he said to me from my notes, would that --

11 Q.    Sure.

12 A.    Okay.  So one thing he talked about, and he -- he has

13 begun, I've noticed, when we recently met, to be better able to

14 talk about the details of his traumatic experiences in Iraq,

15 and so he actually relayed to me the details of one experience

16 in which he and some member of his units had killed a couple of

17 Iraqi insurgents.  And he went into a family home, about three

18 months later, of Iraqi citizens and saw that they were grieving

19 the loss of these two brothers, and then they recognized that

20 these were actually two brothers who they were responsible for

21 killing, and that caused him a great deal of guilt as he

22 witnessed the grief in this family.  And that is an unusual

23 experience.  That sort of thing doesn't happen frequently.

24      And so what he talked to me about, after relaying that

25 experience, is he talked about how they had, you know,

Best - D

1   quote/unquote, destroyed lives and families and even entire

2   cities.

3       So then he went further to say that he now recognized --

4   he said, "My most recent service at Malheur was part of my

5   repentance for that.  Protecting people and liberty rather than

6   taking it away."  And I think that this is how he was now

7   becoming to understand why he was driven to do what he did.

8   Q.   Go ahead.

9   A.   But he went on to say, though, that he really felt as

10  though that -- one thing he said was, "My defense prompted the

11  government's response.  I realize now that it's better for me

12  not to be involved in these activities because I'm bringing in

13  negativity, when what I want to be is a positive influence."

14  He said, "The whole experience has changed my attitude of

15  service away from active defense of life, liberty, and

16  property, and toward humanitarian effort."

17          MR. BARROW:  Your Honor, if I could just interrupt at

18  this point?  Could we get a copy of these notes?  I asked for

19  all *Jencks* materials and didn't get anything, so I have no idea

20  how she's testifying from notes.

21          THE COURT:  Yes.  When the witness is finished,

22  you'll have a chance to review everything she has in her

23  possession, and then we'll go.

24      Go ahead.

25          MS. HAY:  I'll ask a few more questions, then.

Best - D

1  BY MS. HAY: (Continuing)

2  Q.   Dr. Best, in your work, you have a chance to evaluate

3  people who are malingering or who are faking a change of heart

4  in some ways.  Should we be concerned when Ryan Payne tells you

5  these things about focusing on family and humanitarianism that

6  he's just saying what we want to hear?  What was your

7  evaluation of that?

8  A.   Well, that's certainly not my clinical impression.  If

9  anything, I would say that Mr. Payne tends to be overdisclosing

10 rather than underdisclosing, except in terms of his specific

11 traumatic experiences.

12      And he also -- I mean, you can actually see as he's

13 speaking that he is kind of struggling with cogitating on all

14 these things, and you can see that he's wanting very much to

15 understand himself as he's expressing these opinions.

16      So they certainly don't -- as though they have -- although

17 they come out as these very eloquent statements as though he

18 sat around practicing them, it's actually just simply the way

19 he speaks, as I saw consistently, and then this is the way he

20 just works through things.

21 Q.   And he appeared sincere to you when he was speaking about

22 this sort of change in his outlook?

23 A.   To be quite sincere and not to be malingering or trying to

24 fake good, as we call it, in any way.

25 Q.   Okay.  Well, so having diagnosed Mr. Payne with PTSD, do

Best - D

1  you have any concerns he would be a danger to the community if

2  he were released now?

3  A.   No, I do not.

4  Q.   What is the reason for that lack of concern?

5  A.   Well, a number of reasons.  One being that he has a very

6  supportive family to whom he wants to return and stay.  He has

7  expressed now a very keen interest in an amenability to

8  treatment, which he hadn't in the past, and that treatment

9  actually happens to be available there in Anaconda, Montana,

10  where he can receive treatment both for the PTSD as well as the

11  moral injury, which I think would be very important, and he has

12  expressed a desire to do that.

13      He has a very strong work ethic and a strong

14  employability, and that's also, you know, good in terms of

15  preventing future activities or actions that might be

16  problematic.

17      And then he, you know, again, is expressing a lot of

18  prosocial values and a desire to get involved in prosocial

19  activities.  He's talked about wanting to start a,

20  quote/unquote, ranch, basically, where people can come,

21  including troubled teens, as well as veterans, and where they

22  can provide support and assistance.  And so a lot of, you know,

23  very strong prosocial values and goals.

24           MS. HAY:  Thank you.  I have no further questions.

25           THE COURT:  All right.  Counsel, you may approach the

Best - X

1   witness to receive her notes.

2        Doctor, would you give counsel your notes, and then he'll

3   bring it back when he's finished.

4             MR. BARROW:  They're fairly short, Your Honor, if I

5   could just take a minute?

6             THE COURT:  Yes.

7             MR. BARROW:  Thank you, Your Honor.

8

9                      CROSS-EXAMINATION

10  BY MR. BARROW:

11  Q.    Dr. Best, you interviewed the defendant in, I believe,

12  March of 2016?

13  A.    Uh-huh, yes.

14  Q.    And you spent about three and a half hours with him; is

15  that right?

16  A.    I believe so.  I would need to check my notes.  Uh-huh,

17  yes.

18  Q.    And based on that interview, you opined that he had PTSD

19  and alcohol use disorder; is that right?

20  A.    In full remission.

21  Q.    At that time, you didn't -- is that the same as a clinical

22  diagnosis?

23  A.    It's a -- I'm not sure what you mean when you say

24  "clinical diagnosis."

25  Q.    I just noted -- sorry.  I noted in your report you didn't

Best - X

```
 1   call it a diagnosis or a clinical diagnosis.  You called it, I
 2   believe, a conclusion or an opinion.  I'm just wondering if
 3   it's the same thing.
 4   A.    That's interesting.  Let me look.  I'm trying to get to
 5   that page.  I apologize.
 6         It's a DSM-5 diagnosis, which is meaning that -- so I
 7   classified it as a DSM-5 diagnosis, meaning meeting full
 8   criteria from the diagnostic manual.
 9   Q.    And that's both with PTSD and the alcohol use disorder?
10   A.    Yes.  Uh-huh.
11   Q.    The original report did not diagnose the defendant with
12   betrayal trauma or moral injury; is that right?
13   A.    So those are not DSM-5 diagnostic disorders or conditions.
14   Q.    But alcohol use and PTSD are?
15   A.    Correct.
16   Q.    Is it your opinion that the defendant's PTSD caused him to
17   lead the armed occupation of the Malheur National Wildlife
18   Refuge?
19   A.    That his PTSD caused him to lead it?
20   Q.    Yes, ma'am.
21   A.    I'm sorry.  I didn't understand.
22         I believe that his PTSD played a part in terms of
23   propelling his need -- well, propelling his anger toward the
24   government and propelling his need to assuage his guilt by
25   feeling as though he was protecting and defending.  And then --
```

Best - X

1  you know, then these other issues, in terms of the moral injury

2  and the betrayal trauma, factored in as well.

3  Q.   Do you recall that in your March 2016 interview with the

4  defendant he told you that his grandfather was the one that

5  sparked his views of the government?

6  A.   His grandfather had initially sparked those views,

7  according to him.

8  Q.   And that occurred before his service in the military?

9  A.   2008 was when he actually -- as I recall, that I had put

10  in my report here, that it was not really until 2008 that he --

11  sorry.  It was not until 2008, after his grandfather passed

12  away, that Ryan began to seriously consider religion and these

13  other thoughts.

14      I think that his grandfather -- as he presented it to me,

15  anyway, his grandfather sort of laid the foundation of these

16  beliefs, but primarily religious beliefs, and that he inspired

17  him to consider these things; but then it was not until 2008

18  that he sort of took up this mantle more seriously.

19      Sorry.  That was page -- I didn't bring my glasses up

20  here, unfortunately -- page 5.

21  Q.   On page 3 you talk about him sparking his beliefs about

22  government control?

23  A.   Sparking, meaning the foundation of them.

24  Q.   And my only point is that would have been before his

25  military service?

Best - X

1  A.   Yes.

2  Q.   Okay.  In February of 2018, you interviewed him again.

3  How long was that interview?

4  A.   Oh, I did not write down the exact amount of time.  We

5  were unfortunately having a no-contact visit because there

6  weren't any contact rooms available.  So it was a bit more of a

7  brief discussion by phone.

8  Q.   Can you estimate how long?

9  A.   20 minutes?

10 Q.   I saw your notes from that 20-minute interview.  Did you

11 prepare a report?

12 A.   No, I did not.

13 Q.   Why not?

14 A.   Because I was not asked to prepare a report.

15 Q.   Now, you testified that Mr. Payne is no longer a danger to

16 the community despite his diagnosis and your evaluation.  You

17 are, of course, aware that there are tests that clinical -- or

18 forensic psychologists do to determine whether a defendant is a

19 risk of danger or recidivism in the future; is that right?

20 A.   Yes.  I did not conduct a formal risk assessment.

21 Q.   Why not?

22 A.   Because I was not asked to.

23 Q.   Now, between the original interview in March of 2016 and

24 the February of '18 visit, did you treat Defendant Payne for

25 any condition?

Best - X

1    A.    No, I did not.

2    Q.    And, to your knowledge, did he take any medication for any

3    condition?

4    A.    Medication?  I do not believe so.  That is not my

5    recollection.

6    Q.    I'm just asking if you were aware of that.

7    A.    That is not my recollection.

8    Q.    Okay.  Now, you talked about the impact of his military

9    service and particularly as it related to moral injury; right?

10   A.    Yes.

11   Q.    Did you ever review his military records?

12   A.    I did not review his full records, no.

13   Q.    Wouldn't reviewing military records be important in

14   assessing military service as it relates to moral injury?

15   A.    What I did is I reviewed a report by Dr. Brown and --

16   Q.    But that's not my question.

17   A.    Would it be helpful to review the full military records?

18   Q.    Yes.

19   A.    Yes, it would.

20   Q.    Now, you talked about your experience as a psychologist in

21   detecting malingering.  Isn't that experience related to

22   detecting whether someone is malingering related to a

23   psychiatric condition or a mental health condition?

24   A.    Primarily, but it can also refer to whether someone might

25   be overreporting or underreporting or whether or not they're

Best - X/ReD

1    simply a reliable reporter.

2    Q.   But you don't have any special training in telling

3    whether -- if someone is actually sincere or telling the truth.

4    There's no expertise you have in that?

5    A.   Not specific training, no.

6            MR. BARROW:  I have no further questions, Your Honor.

7            THE COURT:  Ms. Hay, any redirect?

8            MS. HAY:  Just briefly to make sure the record is

9    clear.

10

11                    REDIRECT EXAMINATION

12   BY MS. HAY:

13   Q.   Dr. Best, before testifying today, were you able to review

14   a 30-plus-page report from Dr. William Brown?

15   A.   Yes, I was.

16   Q.   And that was a report that concluded that Mr. Payne

17   suffered from moral injury?

18   A.   Yes, it did.

19   Q.   It reviewed his military service in detail?

20   A.   Yes, it did.

21   Q.   Including listing some of his military awards and

22   commendations?

23   A.   Yes, it did.

24            MS. HAY:  Thank you.  No further questions.

25            THE COURT:  Doctor, with respect to your diagnosis

Best - ReD

1   that Mr. Payne had an alcohol use disorder, I think you said it

2   was in remission.

3            THE WITNESS:  In full sustained remission, yes.

4            THE COURT:  Would you recommend that he be evaluated

5   or monitored for potential recurrence of that issue under the

6   Court's supervision in the future?

7            THE WITNESS:  Well, his remission has been sustained

8   since approximately 2010, 2011; so it's been quite a lengthy

9   time and it has not -- as far as I've seen in his history and

10  reports and reports of his family, it's not become an issue

11  since then.  So I don't consider that necessary.

12           THE COURT:  Okay.  With respect to the treatment you

13  indicate might be helpful for him in Montana, would you be more

14  specific?  What kind of treatment are you talking about?

15           THE WITNESS:  Yes.  So the VA facility offers

16  outpatient treatment that would include both group and

17  individual therapy.  I think a middle -- a medication consult

18  would also be helpful.  They may or may not prescribe or

19  recommend medications, but a specific -- specifically, in

20  regards to sleep disturbance, I think that would be helpful as

21  well.  So the VA facility would be able to provide group and

22  individual as well as medication consultation and management.

23           THE COURT:  Is the medication concern you have

24  limited to a sleep disturbance, or does it have more to do with

25  the PTSD and other issues?

1          THE WITNESS:  Both.  Both.  But the sleep disturbance

2     is related to the PTSD, so there are specific medications that

3     they would prescribe that are more effective for those that

4     have PTSD-related symptoms.

5          THE COURT:  Okay.  Thank you, Doctor.  You may step

6     down.

7        Let's get the next witness on the telephone, please.

8          DEPUTY COURTROOM CLERK:  Good morning, Mr. Webb.  My

9     name is Jake.  I'm Judge Brown's courtroom deputy.  Can you

10    hear me okay?

11         MR. WEBB:  Yeah.

12         THE COURT:  Mr. Webb, this is Judge Brown.  We are

13    calling you from a court proceeding in United States v.

14    Ryan Payne.  Mr. Payne and his lawyer have arranged for you to

15    testify in connection with this proceeding, and I understand

16    the government's agreed that you can do this by telephone.  So

17    since you're not here in person, I want to just review a couple

18    of points.  In a moment, the clerk will be asking you to raise

19    your right hand to take the oath of a witness to testify

20    truthfully.

21       Do you have any issue with that?

22         MR. WEBB:  No, ma'am.  Not at all.

23         THE COURT:  All right.  And then because we're

24    speaking by telephone, it's important that you wait before you

25    start to answer, until you're sure the questioner has stopped

1    the question, so that we don't have two people speaking at

2    once.  All right?

3              MR. WEBB:  Okay.

4              THE COURT:  Okay.  So before you take the oath, let

5    me ask you to please state your full name and spell it all.

6              MR. WEBB:  My full name and what?

7              THE COURT:  And spell it all.

8              MR. WEBB:  Okay.  My full name is Robert Charles

9    Webb.  R-o-b-e-r-t.  C-h-a-r-l-e-s.  W-e-b-b.

10             THE COURT:  Thank you.  If at any point, just as you

11   did a moment ago, you're not clear what is being asked of you,

12   please, please let the questioner know you don't understand the

13   question so that it can be made clearer.  All right?

14             MR. WEBB:  Okay.

15             THE COURT:  Okay.  So now please raise your right

16   hand.  You'll next hear the clerk's voice.

17

18                       ROBERT CHARLES WEBB,

19   called as a witness in behalf of the Defendant, being first

20   duly sworn, is examined and testified telephonically as

21   follows:

22

23             THE WITNESS:  Yes, I do.

24             DEPUTY COURTROOM CLERK:  Thank you.

25             THE COURT:  Mr. Webb, you'll next hear from Lisa Hay.

Webb - D

1   She's Mr. Payne's lawyer, and she'll ask you questions.  If the

2   government's lawyer wishes to ask you questions, you'll hear

3   from him.  We'll give you cues along the way as to who is

4   talking.  All right?

5             THE WITNESS:  Okay.

6             THE COURT:  Okay.  Ms. Hay, you may proceed.

7

8                     DIRECT EXAMINATION

9   BY MS. HAY:

10  Q.   Thank you, Mr. Webb.  This is Lisa Hay.  Can you hear me

11  through this microphone?

12  A.   I can.

13  Q.   Great.

14       Mr. Webb, can you tell us where we are calling you?  What

15  state are you in today?

16  A.   I'm in California.

17  Q.   You -- what do you do for a living there?

18  A.   I am an electrician with the water district.

19  Q.   How long have you been an electrician?

20  A.   I've been an electrician for about 12 years now.

21  Q.   And can you tell us how you know Ryan Payne, who's sitting

22  next to me in the courtroom?

23  A.   Ryan and I met when we were in the service.  We were

24  stationed at the same duty station; although, we were in

25  different units.  We met through some mutual friends and became

Webb - D

1  very close.

2  Q.    And did you have a chance to meet his family over the

3  years?

4  A.    Yeah.  I met his ex-wife, his uncle, his aunt, some of his

5  cousins.  I've met a few of his family for sure.  His uncle

6  actually employed me for a few months when I first started in

7  the trade.

8  Q.    Okay.  So it's fair to say you've kept in touch with

9  Mr. Payne after you both finished your military service?

10  A.    Yes.

11  Q.    And what -- what characteristics do you value in Mr. Payne

12  as your friend?

13  A.    Ryan is one of the most loyal and honest people I've ever

14  met, for starters, and that means a lot to me.  Also, no matter

15  where I've been in my life, good or bad, he's always been by my

16  side and been there to -- you know, to lend an ear, talk to me,

17  or advice when I needed it, or to push me in a direction I

18  needed to go to do the right thing and to be a good person and

19  have my life become better and improved.

20  Q.    Was --

21  A.    So --

22  Q.    Can you tell us about how he's been influential in your

23  life?

24  A.    Well, besides just being a good friend, he has seen me

25  through a few difficult times in my life.  When I got divorced,

Webb - D

1    he stood by me and was a really good person to talk to and to

2    lift me up when I was pretty down.

3        And even before that, you know, when I first met my

4    ex-wife, she had two kids from her previous marriage, and I was

5    working basically a nowhere job, and he had been -- he had

6    mentioned multiple times to me about joining the IBEW.  And

7    when the time came, I was like, "Man, I need to do something,"

8    he was like, "Well, why don't you do this?"

9        And he actually went out of his way, even though I missed

10   the application date, to get me in a few days afterwards to

11   fill out an application and start my career path.  So he's been

12   very influential in my life.

13   Q.   Were there some times when you were concerned about Ryan

14   or about Mr. Payne after the military?

15   A.   Post-military, there was a time when him and I talked

16   multiple times about it, where he would spend a lot of time

17   busy, always had multiple projects going on.  You know,

18   whether, you know, a sand car company, and a band, and work,

19   and, you know, he had -- his hands were really full, and I used

20   to tell him he needed to slow down and enjoy what he had and,

21   you know, not push himself so hard, because, you know, you --

22   he just seemed like he was pushing, pushing, pushing and not

23   taking really the time to enjoy his life.

24        But after that, when he -- you know, he -- he did slow

25   down, he met his ex-girlfriend, Summer, and he seemed to slow

Webb - D

1   down and started to take in what was going on around him.

2   Q.   During the time you've known him, has he ever expressed

3   intent to commit violent acts to you?

4   A.   No.  Never.  As long as I've known Ryan, he's always

5   protected people.  He's the kind of person that would give the

6   shirt off his back for a stranger.  You know, it's one of the

7   reasons -- we didn't join the service solely to become violent

8   people or learn how to shoot guns or blow stuff up or anything

9   like that.  We did it because it was our civic duty and

10  something we felt we should do for our country.  It was to

11  protect our country and serve our country, and we did it

12  because it was the right thing to do.

13  Q.   So obviously you're aware that Mr. Payne has pled guilty.

14  He's committed this offense that we're in court about.  Did you

15  have a chance to talk to Mr. Payne more recently, after he's --

16  he's been -- after he was arrested on this offense?

17  A.   Yeah.  We -- we spoke briefly, shortly after he was

18  released in Nevada and right before he went to Oregon, and we

19  talked, and, you know, we just kind of caught up a little bit.

20  And at the end of it, I asked him what his plans were for the

21  future, and he said he wanted to focus on his family.  He

22  wanted to settle down and live a quiet life and get back to,

23  you know, being an electrician and rock climbing.  He lost two

24  years of his life with his children, and he -- he was really

25  adamant about the fact that he wants to be back around them and

Webb - D

1   doesn't want to lose any more time.

2   Q.    Are you planning to attend future events with Mr. Payne

3   and his fiancée whenever that can occur?

4   A.    Yeah.  As a matter of fact, he had mentioned that as soon

5   as all this is done, one way or another, that they were going

6   to get married.  And he told me he couldn't think of a better

7   person to stand at his side, and I told him absolutely.  He

8   stood for me twice.  I would absolutely do it for him.  And I

9   would be honored to do it for him.  I want to see him happy,

10  and I want to see him living his life.

11              MS. HAY:  Thank you, Mr. Webb.  I don't have any

12  further questions.

13              THE COURT:  All right.  Counsel?

14              MR. BARROW:  No questions, Your Honor.

15              THE COURT:  All right.  Thank you, Mr. Webb.  That's

16  all we need to keep you on the line for this morning.  Thank

17  you for making yourself available.

18              THE WITNESS:  All right.  Thank you very much.

19              THE COURT:  All right.  Please disconnect the line.

20              THE WITNESS:  Bye.

21              THE COURT:  All right.  Let's turn now to guideline

22  calculations; but, preliminarily, I appreciate clarification of

23  the parties' positions with respect to disputes about

24  guidelines that are part of the plea agreement.

25       Ms. Hay?

1        MS. HAY:  Your Honor, we are not disputing any of the

2   guidelines that make up the plea agreement.  My statement in my

3   sentencing memorandum was about how those -- the effect that

4   they have on the overall sentence, and we've agreed that the

5   guidelines calculations can -- are -- that we have agreed to

6   them, so we're not disputing them.

7      But we are allowed to ask for a variance from the

8   guidelines, and I think that the way that the --

9        THE COURT:  There was a lot more in your memorandum

10  than argument about variances.  You were, it seems to me,

11  challenging various guidelines that Mr. Payne has agreed to,

12  the extent of them, and all of that, so I'm -- I'm really quite

13  confused.

14       MS. HAY:  Certainly.  Your Honor, I did say on page 2

15  that because we're bound by the agreement, we're not disputing

16  them.

17       THE COURT:  Yes.  But you went on to argue the

18  departure under Note 4.  You went on to argue issues of early

19  disposition.  You went on to argue applications of the

20  guidelines.  So I -- it seems to me that statement is

21  inconsistent with the merit of much of your sentencing memo.

22  So I'm concerned that there's a little bit of inconsistency.

23       MS. HAY:   Your Honor, I think that it's a fair

24  argument to make that even if the guidelines are accurately

25  calculated to include all of those, when you look at the

1    sentence as a whole, that is -- that one arrives at by adding

2    up all those departures, there is an overemphasis on leadership

3    role because of the combination of all of those together.

4        That doesn't mean that individually we're challenging any

5    of them.  We have agreed to each.  But my point was simply that

6    the combination of those together, when you -- when you

7    increase for leadership and when you hold someone responsible

8    for the firearm threats by others and when you do an increase

9    of 10 levels because Mr. Payne was a leader, compared to other

10   co-defendants who got fewer levels, each of those on their own

11   is a valid increase, and we agreed to them.

12       But I think the Court can consider whether the overall

13   effect is to overemphasize punishment for leadership.  And that

14   was my point on all of those, and I hope that I've made that

15   point there.

16       My further arguments are all based on reasons for a

17   downward variance, and those do include, for example, avoiding

18   unwarranted disparity among co-defendants.  I think that's a

19   valid reason for variance that's not a challenge to the

20   guidelines themselves.

21       So we don't dispute the guidelines.  We agreed to them.

22   But we do think there are reasons to have a variance from

23   those.

24       On the one question about the early disposition --

25            THE COURT:  Well, hold on a minute.  I want to hear

1    from the government with respect to the larger question here

2    about the extent to which any of these arguments are really

3    things I should consider in light of the plea agreement.

4            MR. BARROW:  Your Honor, the government's view is

5    that the Court should not consider the arguments that Ms. Hay

6    raises in her memorandum about the guideline adjustments

7    individually or collectively.  Frankly, we think it's improper

8    for her to make those arguments.  If the government were to

9    stand before you and seek an enhancement that it had waived

10   through the plea agreement, Ms. Hay would be the first to

11   allege prosecutorial misconduct and a breach of the plea

12   agreement.

13       We think that the defendant, at an earlier time, agreed to

14   each of these enhancements, agreed that they had met the

15   appropriate evidentiary standard, and that the Court should

16   adopt the joint recommendation for the guideline calculation.

17       It's not just Ms. Hay's arguments in the sentencing

18   memorandum about the guideline adjustments.  It's Mr. Payne's

19   arguments in his letter to the Court urging you not to apply

20   some of those enhancements.  So it is proper to move to 3553

21   factors, but the Court should adopt the joint recommendation

22   for the guideline calculation as it has.

23           THE COURT:  I disagree with the guidelines as

24   recommended to be applied by the parties in your plea

25   agreement.  For example, the acceptance of responsibility

1    agreement is for three levels off, and I'm questioning whether

2    that is a proper application, for the two reasons I've cited.

3              MR. BARROW:  There's no doubt that the Court has the

4    ability to do what it wants to do with the guidelines.  What

5    I'm suggesting --

6              THE COURT:  I don't have the authority to do what I

7    want to do.  I only have the authority and, in fact, I have the

8    threshold duty to calculate the guidelines correctly.  The

9    parties have a plea agreement, though.  I don't want to lull

10   Ms. Hay into responding to questions from me that might be

11   deemed as a breach of the plea agreement, nor do I want that

12   from you, but I have concerns about the guidelines, to which

13   you've agreed, as to their correct application.

14       So I'm concerned about asking for advocacy from each of

15   you because of the risk of an argument that there was some kind

16   of breach of a plea agreement.  We have enough legal problems

17   in the case with respect to potential appeal, and I -- I don't

18   want to be the agent of creating yet another one.

19       So let's do this:  Why don't you take a moment, you and

20   Ms. Hay, and discuss whether you have an agreement about

21   whether I should or shouldn't ask you your positions about

22   questions I have on your agreed guideline application in a way

23   that would preserve the benefit of the agreement for both sides

24   and not put it into jeopardy.

25             MR. BARROW:  Fair enough.

 1          THE COURT:  Everyone can just sit at ease while

 2   counsel confer.

 3                  (Counsel conferring.)

 4          MR. BARROW:  Thank you, Your Honor.  I think the

 5   parties -- and I'll let Ms. Hay weigh in here in just a

 6   minute -- but I think the parties agree that it would be

 7   improper for me to advocate for a position that isn't laid

 8   out -- on the guidelines that isn't laid out in the plea

 9   agreement.

10       So if, by way of example, it would be improper for me to

11   advocate that the Court only give him two levels for acceptance

12   of responsibility.  Although, in theory, we could, through the

13   terms of the plea agreement, do that; but we will not.

14       In other words, I could argue that subsequent events, as

15   contemplated by the plea agreement, would be in operation

16   through that paragraph.  We're not going to do that today.

17       I can explain to the Court what our position of the plea

18   agreement is, but I can't advocate --

19          THE COURT:  I know what your position is.  The plea

20   agreement speaks for itself.

21       So what you're saying is you don't intend to argue or to

22   make any presentation to the Court about the guideline

23   applications.

24          MR. BARROW:  No, Your Honor.  I think we're bound by

25   the plea agreement, and I think Ms. Hay is as well.

1        THE COURT:  And her arguments, under the title of a

2   3553(a) variance, that do, in fact, argue about the correct

3   application of the guidelines.

4        MR. BARROW:  I think those should be ignored.  I

5   think that that would be improper for the Court to consider.  I

6   think that Ms. Hay can freely argue for an appropriate sentence

7   under 3553, including comparing his sentence to that of his

8   co-defendants, but I don't think that he can argue that a

9   guideline application is the problem.  I think the guideline

10  application --

11       THE COURT:  Well, for example, the Note 4 enhancement

12  departure -- Mr. Ritzheimer got a nine-level enhancement, by

13  the Court's determination, as I recall.  That may have been the

14  Court's application.  I don't remember what the parties' plea

15  agreement was.

16       MR. BARROW:  It was both, Your Honor.  I checked my

17  notes.

18       THE COURT:  Ms. Hay has argued that that is something

19  the Court should take into account in making the decision about

20  the extent to which such an enhancement should be applied.  Is

21  that a proper argument I should take into account, or is it one

22  you contend I should ignore?

23       MR. BARROW:  Ignore, Your Honor.  She has agreed that

24  10 levels is appropriate in this case and that's been

25  established by the appropriate --

1            THE COURT:  Even though that may be an argument that

2       comes under the unwarranted disparity heading that you just

3       said was appropriate.

4            MR. BARROW:  I have no objection to her arguing that

5       the government's recommended sentence of 41 months would

6       produce a disproportionate result, but I do object to her

7       arguing that Application Note 4 is inappropriate at 10 levels.

8            THE COURT:  All right.  Ms. Hay?

9            MS. HAY:  Your Honor, I can certainly abide by that.

10      I thought I had been careful in trying that.  Apparently, I did

11      not.  I recall that Ms. Wood's and Mr. Ritzheimer's arguments

12      similarly argued that the government's choice of how many

13      levels under Application Note 4 to give each defendant was

14      based not on any sort of empirical evidence but more their view

15      of leadership, and she made a similar argument.  But I am not

16      intending to say that the Court should not impose the 10

17      levels.  I'm simply saying that gets you to a sentence of 41

18      months, and I think a variance from that is -- is valid for a

19      number of reasons.

20           And we could -- we could go through those, Your Honor, but

21      I won't argue against those guidelines themselves, as we agreed

22      not to.

23           THE COURT:  Mr. Barrow, do you object to my -- do you

24      object to Ms. Hay making an argument in response to my concern

25      that the acceptance of responsibility adjustment should not be

1    applied for three levels, but two?

2            MR. BARROW:  I do not object to her advocating for

3    three levels, as she's totally entitled to do that.

4            THE COURT:  No.  Well, but that requires her to

5    answer my question about why I may not be inclined to apply a

6    three-level downward adjustment.  You don't object?

7            MR. BARROW:  No, Your Honor.

8            THE COURT:  Well, let's start there, then, Ms. Hay.

9        The three levels that are included in the plea agreement

10   were agreed to at a time when Mr. Payne accepted responsibility

11   about six weeks before trial, entered into a plea agreement,

12   pled guilty, and off he went.  And then after the acquittals in

13   the first trial, he moved to withdraw his plea, putting the

14   government to the task of litigating that issue which squarely

15   raises acceptance of responsibility by arguing he wasn't guilty

16   and he should be allowed to withdraw his plea.

17       That motion, I ruled against.

18       Then, after he was released from custody in Nevada, we

19   have the documented two instances of pretrial release

20   violations.  These are typically actions that are congruent

21   with the conclusion that a person did not accept full

22   responsibility, at least with respect to the one level, even if

23   the government makes the motion.

24       So those are two concerns I have here with respect to

25   accepting the presentence writer's recommendation or the

1    agreement of the parties of three levels.

2        What would you like to say?

3        MS. HAY:  Yes, Your Honor.  I would like to respond.

4    On the final motion to withdraw his guilty plea, Mr. Payne was

5    unique among the co-defendants who filed the motion, in that he

6    filed that motion before the verdict.  His was not a buyer's

7    remorse.

8        THE COURT:  Well, it was buyer's remorse, I have so

9    found, but it wasn't after the verdict.  It was while the case

10   was developing and he was observing it.

11       MS. HAY:  Yes, Your Honor.  I think the motion does

12   set out the reasons as being primarily because the plea here in

13   Oregon had been tied to an expected resolution in Nevada.  Of

14   course, it was said on the record it wasn't a promise and it

15   was not necessarily going to happen, but what occurred was that

16   the entire plea in Nevada fell apart, and I would say not --

17   not because of his fault, and so this -- this motion explains

18   that the intervening circumstances in the District of Nevada

19   provide a fair and just reason for the Court to withdraw --

20   allow him to withdraw his plea.

21       Of course there's other statements in here about the

22   possible *Brady* violation, things that weren't presented before

23   his guilty plea, et cetera; but that was the primary reason,

24   Your Honor, was that the plea had been based on an

25   understanding that there would be a link to a Nevada plea that

1    didn't occur.

2        So I think, unlike some of the defendants who simply

3    wished they hadn't pled guilty after the acquittal, Mr. Payne

4    had a much different reason for moving to withdraw.

5            THE COURT:  That whole articulation was something, of

6    course, the Court did not accept.  I spoke with him at length

7    about this case being separate from the Nevada case, and he was

8    either going to surrender his rights and plead guilty, or he

9    was entitled to go to trial with everyone else in that first

10   round.

11       So, to me, the arguments made in the motion and in -- in

12   all of that were -- were absolutely inconsistent with accepting

13   responsibility under the plea, under his plea agreement.  So

14   I -- I'm --

15           MS. HAY:  So, Your Honor, I guess I would think

16   there's also the question of why he would be treated

17   differently from the other co-defendants.  Mr. O'Shaughnessy

18   also moved to withdraw his plea.  He was given a full credit

19   for acceptance even though they filed that.  Mr. Ritzheimer

20   filed a motion to withdraw.  He was given full acceptance.

21       So I think Mr. Payne did file a motion.  It was earlier

22   than the others.  I don't read this as him saying he doesn't

23   want to say he's guilty and accept responsibility and that way

24   to say, "I did this offense."  It was he didn't think that the

25   bargain he reached with the government and the -- frankly, the

1    agreement to some of the --

2         THE COURT:  To me, it's just another example of

3    Mr. Ritzheimer [sic] saying one thing on one day and something

4    else on another day.  He changes positions and has through the

5    course of this case repeatedly, and that -- the argument that

6    this whole litigation about withdrawing his plea did not

7    undermine acceptance of responsibility as -- except --

8    especially in light of the release violations, is -- is

9    something that I don't think I can ignore.

10        MS. HAY:  Your Honor, the release violations are a

11   separate issue from the motion to withdraw.  I feel that his

12   motion to withdraw was not saying he's not willing to say he's

13   guilty, but I made that point.  The -- that is, he could still

14   plead guilty, but not under the agreement that we had reached.

15       The fact that the other co-defendants were not asked to

16   give up their credit, I think, also weighs in favor of saying

17   he should get the three points that the government has offered

18   him.

19       Pretrial release violation.  I'm not aware whether other

20   co-defendants had pretrial release violations.  I think they

21   did as well, including Mr. Ritzheimer, who was with Mr. Payne

22   during the release violation you're referring to.  And, again,

23   he didn't lose his acceptance of responsibility despite his

24   pretrial release violation and his --

25            THE COURT:  Mr. Ritzheimer's release violation was

1    post-sentencing while he was awaiting surrender.

2              MS. HAY:   Thank you, Your Honor.

3         So I'm not aware of others who had release violations.

4         So it is true that it is possible to withhold part of an

5    acceptance of someone who's violated pretrial release, and

6    Mr. Payne acknowledges that violation.   We would ask the Court,

7    nevertheless, to grant the three levels for acceptance, as

8    recommended by the government, because, in our view, there

9    wouldn't be -- it's not as egregious a violation as some, and I

10   don't think Mr. Payne was intending to undermine -- undermine

11   the plea agreement when he did those.   It was thoughtless and

12   wrong, but not an intentional -- intentional attempt to violate

13   the agreement.

14        So, Your Honor, we would ask the Court to stay with the --

15   with the agreement on those counts.

16             THE COURT:   The guidelines involve numerous specific

17   references versus the basic offense level of 10, with the

18   recommendation of an additional three levels because the

19   underlying charge involved possession of a dangerous weapon and

20   its threatened use.

21        The next guideline issue involves an upward enhancement

22   because the -- it's recommended that the Court find the

23   defendant was an organizer.

24        Then the next set of issues involve acceptance, whether to

25   give it, and, if so, to what extent.

1          Then the next issue is the Note 4 enhancement.

2          So before I hear any arguments about Section 3553(a) and

3    the proper exercise of discretion and avoiding unwarranted

4    disparity, I believe I need to make those formal rulings on the

5    application of the guidelines and then hear argument as to what

6    is or isn't a reasonable sentence within the parameters of the

7    parties' plea agreement.

8          So with that, Mr. Barrow, do you have anything to add to

9    what has been written or presented with respect to the

10   guideline calculation that gets to a final offense level and

11   criminal history calculation so that there is a starting

12   advisory guideline range?

13         Do you have anything else you want to add?

14              MR. BARROW:  No, Your Honor.  Thank you.

15              THE COURT:  Ms. Hay, anything else on the guideline

16   calculation that leads to the advisory guideline range, as

17   opposed to Section 3553(a) arguments?

18              MS. HAY:  I just wanted to clarify one point,

19   Your Honor.  The government was also recommending a two-level

20   early disposition.

21              THE COURT:  That's true, too, yes.

22              MS. HAY:  I had made a point that Mr. Ritzheimer

23   received a three-level variance even though he pled guilty

24   later.  The government explained that was an effort to

25   counterbalance an earlier miscalculation, so they changed it.

1          So I understand that.  I do think, nevertheless, the

2     people who pled guilty before Mr. Payne, at a week and two

3     weeks' rate before him, did receive a three-level early

4     disposition.  Again, I think it just goes to the -- the amount

5     of discretion in these guidelines.  And we would ask the Court

6     to follow at least the government's recommendation of two

7     levels for early disposition.

8               THE COURT:  Well, the early disposition variance is

9     recommended in a lot of plea agreements based, in my

10    experience, on the value to the government for early

11    disposition, and I'll note Mr. Payne was the second-named

12    defendant here.  He clearly was a significant part of the

13    government's trial preparation for the first trial.  And six

14    weeks before that trial, when you measure that six weeks as to

15    the day we start jury selection, is one thing; but we were in

16    the middle of daily pretrial conferences about three weeks

17    after his plea.

18         So this adjustment for early disposition, when it comes in

19    the context of a plea agreement, takes into account the

20    parties' negotiation of the value of the agreement in the

21    context of early disposition.

22         All right.  That said, I'm going to make the rulings,

23    then, on the guidelines that apply, and then I would like to

24    hear the government's argument about what is a reasonable

25    sentence, also taking into account Mr. Payne's arguments about

1    avoiding unwarranted disparity.

2        And then, Ms. Hay, I would like to hear from you, and then

3    if Mr. Payne has anything else to add, of course he will have

4    that chance.

5        So we begin in the presentence report at paragraph 42.

6    I'm adopting the recommendation of a 13-level base offense

7    level, which is also consistent with the parties' plea

8    agreement.  There was argument in the defendant's memorandum

9    about the three-level enhancement to the underlying base

10   offense level of 10 and an argument about the defendant not

11   personally having threatened anybody with a firearm -- a fact

12   that I think could be contested from the video evidence and the

13   testimony of Sheriff Ward with respect to the urgency with

14   which Mr. Payne argued his position when they met in person;

15   but, nevertheless, Mr. Payne pled guilty to a conspiracy

16   charge, and he's liable for, in terms of relevant conduct, the

17   conduct of all conspirators.  So the application of an offense

18   level of 13 for a starting point here, in this case, is

19   undoubtedly correct.

20       The next guideline issue is at paragraph 45, and it's a

21   role adjustment.  It's recommended that the defendant be given

22   a four-level enhancement as an organizer or leader.  The

23   parties agreed to that as well.  That is, in my judgment, fully

24   supported by the record.  So I'm adopting paragraph 45 and the

25   plus four there, which leads, as noted in paragraph 47, to an

adjusted offense level of 17.

I will defer to the parties' plea agreement on full
acceptance of responsibility and award all three levels,
noting, however, the Court's concern that relying on what
Mr. Payne has to say at any particular point in time is a very
difficult situation since he's taken numerous articulated
positions on matters that are of significance here.  So after
three levels off for acceptance, he's at a level 14.

At the end of the presentence offense level analysis, in
paragraph 93, which is on page 21, and paragraph 92, is the
discussion of the Note 4 upward departure.  The parties agreed
to a 10-level upward departure.  I'm going to apply 9 and not
10 here, in paragraph 93, to avoid unwarranted disparity in the
big picture among all the convicted defendants.

I note Mr. Ritzheimer, among others, was given 9 up.

That takes us to level 23.

And at level 23, Criminal History Category I, the range is
46 to 57 months.  The parties, by agreement, argue a two-level
downward variance for early disposition.  I'm going to accept
the parties' joint recommendation here, which takes us to 21,
Criminal History Category I, and there the range is 37 to 46
months.  It's within that range that the Court starts its
assessment of what is a reasonable sentence.

And, Mr. Payne, for your purposes, we covered this at the
time you pled guilty; but as a reminder, I need to take into

1    account what sentence is sufficient to punish you for your

2    admitted criminal conduct, to promote respect for the law by

3    you and others similarly situated, to persuade you not to

4    repeat this conduct in the future, to persuade others who

5    consider what happened to you from not doing it in the first

6    place, and a sentence that's sufficient to protect the

7    community.  Community safety is something that has to be taken

8    into account.  And then all of those considerations have to be

9    measured against what is enough but not too much, taking into

10   account your personal history and characteristics.

11        So with that in mind, then, Mr. Barrow, the government's

12   sentencing recommendation, given the guideline assessments that

13   I've determined apply here.

14             MR. BARROW:  Thank you, Your Honor.  The government

15   is going to continue to recommend a sentence of 41 months of

16   incarceration, followed by three years of supervised release,

17   and a $100 fee assessment.  That is within the guideline range

18   of 37 to 46 months that the Court has now found.

19             THE COURT:  Roughly, a mid-range sentence?

20             MR. BARROW:  Yes, Your Honor.

21             THE COURT:  All right.  Do you have anything else you

22   want to add?

23             MR. BARROW:  I do, Your Honor.  In support of that

24   sentence, I guess I would like to start with the defendant's

25   apology, which is affixed to the defendant's sentencing

1   memorandum, and he candidly admits that that apology has to be

2   assessed in light of the context of his integrity, and that

3   context, as the Court has alluded to, includes a number of

4   factors.  First, that the Court has already alluded to, that

5   the defendant pled guilty and moved to withdraw his plea.  In

6   the Court's opinion, denying that motion to withdraw his plea,

7   the Court noted that it was buyer's remorse, and the government

8   agrees.

9       It also includes the fact that the defendant had agreed to

10  various sentencing enhancements that in his own apology to the

11  Court he urges this Court not to apply.

12      It also includes the fact that he agreed to abide by

13  release conditions in December of last year and then quite

14  quickly violated those release conditions.  He initially

15  chalked that violation up to a misunderstanding about those

16  release conditions.

17      The Court should also be aware that perhaps the only other

18  defendant the government recalls giving an apology for the

19  events at Malheur is Jon Ritzheimer.  It's shortly after

20  Mr. Ritzheimer was sentenced and apologized here in this

21  courtroom that he posted a letter to social media in which he

22  claimed that the victim impact statements were embellished;

23  that the victims were actually in fear because of the FBI, not

24  the occupiers; and that he, in fact, was not apologizing to the

25  government.

1          Obviously, we're not here for Mr. Ritzheimer.  We're here

2     for Mr. Payne.  And even if the Court were to accept

3     Mr. Payne's apology at face value, we must, of course, consider

4     the 3553 factors.  The government's laid out those factors in

5     its sentencing memorandum; but I would like to note, again, the

6     seriousness of the offense in this case, the dislocation that

7     defendant's conduct caused the citizens of Harney County.

8     There are, in fact, refuge employees that had deep roots in

9     Harney County that relocated following the occupation because

10    they do not feel comfortable living in that area.

11         The occupation, of course, as we've argued repeatedly,

12    also was based on a profound disrespect for the law.  The

13    defendant didn't respect the Ninth Circuit's opinion reversing

14    the original sentence in the Hammonds' case; he didn't respect

15    the district court's resentencing of the Hammonds, consistent

16    with that appellate opinion; he didn't respect Sheriff Ward for

17    following the law; he didn't respect the government's ability

18    to own land in Harney County; and he didn't respect the federal

19    agency's role in Harney County and, perhaps most importantly,

20    the employees in Harney County who were there doing their jobs.

21         The Court must consider also adequate deterrence to deter

22    both, generally, conduct of this nature in the future and,

23    specifically, for the defendant.

24         In the government's view, not only the defendant, but the

25    Patriot community at large, has to understand that an offense

of this nature, an armed conflict with the federal government, taking over a federal facility, is a serious offense that warrants a serious sentence.

I would like to turn now to the characteristics of the defendant himself.

Payne used his status as an Army veteran and his training as an Army veteran to kind of lend a veneer of legitimacy to the occupation.  He, in fact, used his training and his experience to plan the operation, as we've outlined in Exhibit A to the government's sentencing memorandum, and he used his status as a combat veteran to recruit others to join the occupation.

Once they arrived in Harney County, he used his knowledge and military tactics to train them and to organize them in patrols and firearms training.

I know the Court is concerned with disparity between similarly situated defendants.  Mr. Payne is the most culpable defendant that the Court will sentence in this case.  Without Mr. Payne, I don't believe that the group would have had the wherewithal to take over the Malheur National Wildlife Refuge in the style that they did.  I don't believe that the occupiers of the refuge would have had the knowledge and the ability to fortify the refuge with an armed gunman in a tower, armed guards at the gate, and patrols.

Mr. Payne has repeatedly said that he didn't want

1   violence; but the problem with that argument is that

2   operations, like an armed takeover, necessarily contemplate

3   violence.  That was true for Bunkerville with the armed

4   response in Bunkerville, and it was true for the OMD proposals

5   that we've outlined again in Government's Exhibit A.  Those

6   proposals included breaking federal prisoners from marshal's

7   custody.  That is an operation that contemplates violence.

8       It was true for the OMD proposal to lead an armed takeover

9   of a courthouse.  That operation contemplates violence.  It was

10  actually expressly stated in the OMD response matrix that there

11  were operations that they would undertake that would involve

12  violence.

13      Now, there was also a conscious effort to disguise that

14  violence by combining the militia groups with the protesters.

15  And it was Mr. Payne who articulated that in Government

16  Exhibit A.  He talked about the cohesion between protesters and

17  the militiamen and how that cohesion, by mixing the two

18  together, could create opportunities to do something like an

19  armed takeover of a prison or a federal facility.

20      That's, of course, exactly what happened in Malheur.

21      The government believes that the sentence of 41 months in

22  prison is both reasonable and appropriate.  Again, it

23  recognizes the defendant's role as the architect of the

24  occupation and one of its leaders, and it provides a deterrence

25  for others who may follow in Mr. Payne's footsteps to promote

1    armed conflict with the federal government.

2         Thank you, Your Honor.

3         THE COURT:  What is your response to Ms. Hay's

4    mitigation arguments with respect to, among other things, the

5    diagnosis of PTSD, the other mental health evaluations that

6    were provided, the weight the Court should give to the fact of

7    Mr. Payne's prior military service?

8         MR. BARROW:  Your Honor, as we argued in our

9    sentencing memorandum, Mr. Payne served his country with honor,

10   and we take nothing away from that.  It's clear that Mr. Payne

11   had a difficult background that started well before he ever

12   entered the military.  It's clear, from the sentencing

13   materials submitted by Ms. Hay, that he had a difficult

14   childhood.  But we do have a problem with the idea that his

15   PTSD somehow caused him to come to the refuge.  It appears

16   clear from the defendant's materials that his antigovernment

17   views predate his involvement with the military, and they are

18   over such a sustained period that we don't believe that the

19   diagnosis reflects his criminal acts; in other words, it didn't

20   cause the criminal acts.

21        This occupation was not borne of some spontaneity.  It

22   wasn't -- it wasn't an impulsive act in any way.  It was

23   planned, not just for months by Mr. Payne specifically at that

24   location, but similar conflicts were planned by Mr. Payne for

25   years, and we simply don't think that the diagnosis offered by

1   Ms. Best should mitigate the sentence that we've -- we've

2   recommended.

3       We've already come quite a ways from what could be

4   recommended in this case, and we think that's adequate.

5           THE COURT:  All right.  Thank you, Mr. Barrow.

6           MR. BARROW:  Thank you, Your Honor.

7           THE COURT:  Ms. Hay.

8           MS. HAY:  Thank you, Your Honor.  I think I'll start

9   just responding to a few of the government's arguments before I

10  forget what they just said, if that's all right.

11          THE COURT:  Sure.

12          MS. HAY:  I want to make clear that we're not arguing

13  that Mr. Payne's PTSD or military experience caused him to

14  commit this criminal act.  He took responsibility.  He pled

15  guilty.  He's not arguing a mental defense, but I do think it

16  is important to recognize what Dr. Brown wrote in his report,

17  what Dr. Best had discussed, that Mr. Payne's experiences did

18  influence his desire for some kind of morally correct, concrete

19  way of defining his -- his responsibilities in his universe,

20  and that's why he was attracted to this theory based on the

21  Constitution as a -- and also on the Bible -- you know, his two

22  guiding principles right now.  And I think those help him in a

23  sense of when he's feeling uncertain and he's trying to

24  identify who he is.  Those have been a guiding principle for

25  him.

1    And I think it's important because this occurred when he

2 was such a young man, and I guess I want to make sure we

3 counter what the government said, that his antigovernment

4 attitude predated the military.  I don't think the record shows

5 that at all.  He joined the military as a 17-year-old teenager.

6 And what his mother said and his aunt said in those letters is

7 he wanted to serve the country.  He wanted to join the FBI or

8 the CIA.  He was excited about government service.  He had no

9 antigovernment attitudes when he was 17.  He was, in fact, the

10 opposite.

11    The government is pointing to a statement that his

12 grandfather sparked his idea about government control.  I think

13 that occurred much later for him.  So he was not

14 antigovernment.  He wanted to serve the government, and he

15 still feels very proud of his military service.  So there is

16 something that occurred in that military service where he was

17 abandoned, essentially, by the people that he considered

18 superiors, people who would be supporting him, and that had an

19 effect on him, and that's not unusual for soldiers.

20    Mr. Payne served in the military and received a number of

21 honors, and, Your Honor, the government feels that he was

22 arguing against a guidelines calculation in his sentencing

23 letter.  I don't think he was arguing against.  He mentioned

24 should the -- should Your Honor impose the terrorism

25 enhancement, and I -- I think he's reflecting.

1          What I've been trying to tell him is this isn't

2    necessarily about terrorism.  It's a piece of the guidelines

3    that happens to be under the terrorism statute, but it doesn't

4    mean that he's a terrorist.  But he has heard about the

5    terrorism enhancement.  He's heard others talk about that.

6          When he was in Iraq, he received two -- numerous

7    commendations, but two -- one was the Global War on Terrorism

8    Service Medal and the other was the Global War on Terrorism

9    Expeditionary Medal.  So I think we can understand how having a

10   terrorism enhancement applied is something that very much

11   chagrins him and has bothered him.

12         So I didn't read his letter, Your Honor, as saying that he

13   was arguing against the guideline enhancements.  I think he was

14   thinking whether you have to call it a terrorism enhancement.

15   And I explained that it's not -- it doesn't mean that the

16   government is calling him a terrorist.  It's an application

17   that shows that this was a serious offense that was designed to

18   affect the conduct of the government.  He agrees with that.

19         On the recordings that the government provided a

20   transcript of, I don't want to spend too much time on those,

21   Your Honor, because I think there's certain points that we can

22   make briefly.  One is that all of those recordings are First

23   Amendment protected advocacy.  None of those are actually him

24   inciting a lawless act.  The First Amendment protects

25   advocating lawlessness.

1          THE COURT:  Detaining refugees without lawful

2     authority is certainly an unlawful act.

3          MS. HAY:  But, Your Honor, that's exactly the point.

4     The First Amendment actually allows you to say those things.

5     He wasn't posting those online.  He wasn't advocating those in

6     articles.

7          THE COURT:  No.  They were posted on the internet in

8     a drop box where anybody could drop in.

9          MS. HAY:  Your Honor --

10         THE COURT:  I don't think this is an argument that is

11    worth your spending any time on.  Certainly, he has a First

12    Amendment right, but the point is that the Court is to take

13    into account his personal history and characteristics in its

14    entirety.

15         MS. HAY:  Right.

16         THE COURT:  You can't isolate honorable military

17    service and disregard, then, what he did with that there.

18         MS. HAY:  Your Honor, I don't mean to disregard.  I

19    think the government would agree with me that the drop box was

20    a private drop box, was a -- the government received it by a

21    search warrant.  There was a group of five people speaking.

22         THE COURT:  The point is the personal history and

23    characteristics of the defendant are the entire package, not --

24    not just the ones that one wants to emphasize as his advocate;

25    and, unfortunately, there is a lot to detract from his

1    honorable military service.

2         He was 17 when he started.  He's 34, almost 35.  That was

3    a lifetime ago.  When he left, he made a number of choices that

4    have led to today, but most of which won't be captured in

5    today's sentencing, for reasons that are far beyond our

6    control.

7              MS. HAY:  Your Honor, he's not denying that he was

8    involved in those groups.  Of course, we're not denying all of

9    those.  I agree that that is a factor the Court could consider.

10        I do think there's a -- there's a desire on the part of

11   the government to, sort of, make Mr. Payne the figurehead for

12   all of this.  And I want to point out that in the sentencing,

13   for example, of Mr. Jason Patrick, the government was able to

14   point to videos where he's advocating to tell people to come

15   there.  "Bring your guns.  Come."  Videos of Mr. Ritzheimer

16   doing the same thing.  I didn't read in the presentence report

17   and I'm not aware of any such images of Mr. Payne where he's

18   actively in videos saying, "Come here.  Bring your guns."

19        The government's OMD recordings, I do want to emphasize

20   those are private recordings between five people that were put

21   in a separate drop box that the government got by a search

22   warrant.  So it's not the same as advocacy out loud to do these

23   things.

24        When I've listened to many hours of these recordings, most

25   of them are -- I would characterize as discussions, not plans.

1  Not to justify what they discussed, but it's a discussion about

2  the moral ability to act against the government, the moral

3  ability to stand up against oppression, and it is protected.

4  Some of it is distasteful.  We don't believe in it.  But I

5  don't think that that's a crime that Mr. Payne should be being

6  punished for.

7          THE COURT:  I don't intend to punish him for it,

8  Ms. Hay.  What I'm saying is, however, you can't simply point

9  to honorable military service and say that equals a reason to

10  vary from the guidelines, when the entire package includes this

11  very alarming history of quite a willingness to put oneself

12  ahead of the law and the Constitution.  Those references to

13  detaining refugees in Montana are simply incredulous.  The idea

14  of breaking someone out of the marshal's custody or raiding a

15  courtroom, if they weren't so frightening, they would be

16  ridiculous.

17      If the notion wasn't that these are fanciful and no one

18  could ever act on them, then one has to look at what someone

19  does with firearms who has very non-peaceful attitudes.  I

20  don't know how, in considering his personal history and

21  characteristics, I can ignore the OMD statements.

22          MS. HAY:  Your Honor, I wasn't asking you to ignore

23  them.  I was trying to place them in the context of

24  understanding the difference between those as conversations

25  among people who were thinking about these things, but not

acting on them, not planning, versus the call to arms that
other defendants have made in the case.

So when the government stands here and says that Mr. Payne
used his status to recruit others to join them, I don't think
it's fair to put that all on him.

I think it is fair to say that Mr. Payne used his military
status to gain legitimacy with these organizations, and he used
his military knowledge when he was at the refuge. As I said in
my sentencing memo -- excuse me -- what he has explained is
that he understood that you can't have all of these young men
loitering about this place and not doing something, and he
created these rounds and rotations of work and guard duty and
rest in order to make sure everybody was structured.

Part of that did involve having a shooting range, where
they would go shoot their firearms, and the government
informant helped set that up; but that was to avoid having
people just do their own target practice.

He's a very disciplined, very organized person, and he was
able to get people to follow him in that; but I -- I think
there's something that is missed when we just say, "Well,
that's the wrong thing to have done." Obviously, it was wrong
to go to the refuge, to take it over the way they did, and
that's why he's pled guilty. But when he was there, I think
what he was trying to do, if we were trying to understand his
intent and punish him for what he was culpable of, his intent

at that point was to keep these young men organized so that

they could be disciplined, so that they would not respond

poorly.

I am -- I gave you the quotes from the proceeding that I

reviewed early on when he's at the refuge, and there's the

camera there.  A recording is set up, and he's telling them,

"We don't want violence.  Sheriff Ward is a good man.  I've

spoken with him.  Don't hold all this against him.  If they

have misguided ideas, we need to be careful."

So, Your Honor, I'm not avoiding his statements with the

militia, but I do think we have to be careful from just taking

that and painting all of his intentions the opposite way as

well.  Because I think his intentions there were to be

nonviolent and were there to try to control so that people

would not do the wrong thing.

The government, in their memo, didn't mention that

Mr. Payne wasn't simply arrested at the end of this, that he

was the person who got out of the car.  I think that's an

important point that his acceptance of responsibility started

on that day, on that highway, when the police pulled over the

car that was being driven by LaVoy Finicum and Mr. Payne put

his hands out the window.  When he was ordered to get out of

the car, he got out of the car.  He backed up to where the law

enforcement officers told him to.  He was wearing his sidearm

at the time.  He didn't do anything threatening.  He followed

1    the rules.  He spoke softly.  He explained there were people in

2    the car, young women in the car, and he started to follow their

3    commands that day.

4        And, Your Honor, despite the moment of -- I don't know

5    what we can call it when he violated his pretrial conditions,

6    the last --

7              THE COURT:  "Hubris" is what I call it.

8              MS. HAY:  Hubris.

9              THE COURT:  He made some choices along the way.

10             MS. HAY:  Yes.

11             THE COURT:  Some of them he's being held accountable

12   for today, and others are to his credit.

13             MS. HAY:  So I think, Your Honor, that moment,

14   though, started -- his acceptance of responsibility didn't just

15   stop with being arrested and coming here to the courthouse.  As

16   you know, he's been in custody for two years.  He hasn't had

17   the chance, as some of the others have, to demonstrate

18   post-offense rehabilitation out of custody and there really are

19   not programs, and the like, that he can do while he's in jail.

20   I've pointed out to pretrial and to the probation office that

21   the county jail where he spent time has been remarkably

22   difficult.

23       County jails, they just don't have the same resources as

24   if you're sentenced to federal prison, and so you are

25   constantly being disrupted by people coming in and out.  After

1    you meet with your lawyers, they strip search you after every

2    time.  So it's an added difficulty to have been kept in the

3    county jail, and I think the Court can consider that.

4        What I did want to point out, Your Honor, is even though

5    he hasn't had the opportunity out of custody to engage in

6    post-offense rehabilitation, he has been doing that on his own.

7    He has been studying the Bible himself.  He has been trying to

8    think through his -- his thinking to understand how he got to

9    where he is, to figure out how to focus his efforts in the

10   future, and he will tell you that he's made some choices about

11   his future.

12       I think he had the opportunity, when he got arrested, to

13   start having some role models of people who could understand

14   him, but who could give him a different perspective.

15       You'll recall, Your Honor, that my co-counsel in this case

16   was Rich Federico, someone who had a military background.  He

17   and Mr. Payne were able to talk about honor and about service

18   to the country, about the oath to defend the Constitution and

19   what that means outside the military.

20       He did meet with Dr. Suzanne Best when he was first

21   arrested, and her questions to him helped him start on a path

22   of self-analysis and discovery and think through what he is

23   doing and why.

24       Your Honor, Mr. Payne also developed a relationship with

25   his attorney in Nevada.  Mr. Ryan Norwood.  He flew here today.

He is in the front row here.  He came today just as a support

for Mr. Payne and told me that Mr. Payne was a different person

from when he first met him in Nevada to when he left.  This has

been a progression over the course of two years where he's been

able to show some rehabilitation and some change.

Your Honor, Mr. Payne is also supported by other family

members who are here in the Court.  I wanted to acknowledge his

mother is here, the fourth one over, Elisheva Liebschutz and

his fiancée Areil Rincon is here, and they're both here to

support him.  They wrote letters to the Court, which I won't

read; but, obviously, he's somebody who has got a great deal of

support and good characteristics.

Your Honor, my short response on the guidelines is the

guideline sentence is 15 to 21 months, when you count

leadership and the firearm, before the upward departure.  And

we agreed to that upward departure because this is a

significant sentence.  The upward departure of ten levels --

nine, if Your Honor imposes that -- is warranted because this

was an offense that was calculated to affect government

employees, and it did have that effect.  There's no denying

that Mr. Payne recognizes the effect that it had.  So that's

the reason there's an upward departure, but there are grounds

for downward departures in cases that are related to the

individual themselves.

And what I hope the Court will consider is who the person

1    is who's here in front of the Court today and what are the

2    factors that brought him here.

3        The Court should impose a sentence that promotes respect

4    for the law, engages in deterrence, protects the public, and

5    supports the rehabilitation of the defendant.  I think we can

6    agree that rehabilitation of the defendant in this case would

7    be better served out of custody if he's able to be in a

8    supportive family, if he can go to the VA sessions that are

9    available for him in Montana and not continue isolation for him

10   from those supports.

11       Protection of the public?  I understand his statements to

12   OMD on those recordings are frightening; but, again, I listened

13   to them as more a musing rather than plans.  And he will tell

14   you that he's not intending to join those groups anymore.  He's

15   not intending to be a part of that.  If the Court were to make

16   an added condition that he not participate with those

17   individuals from that recording, I don't think he has any

18   objection to that as another -- another condition.

19       Dr. Best said that she didn't see reasons why he was a

20   risk factor for the public from what she could look at, and

21   that's because he's not defiant.  He's remorseful.  Unlike some

22   defendants here who went to trial and then came to court and

23   were sentenced, he pled and accepted responsibility.  He is the

24   type of defendant who ordinarily in a court like this would be

25   thinking about asking for probation because of his -- this is

his first criminal history, first criminal offense.  He has a long work history.  He has family connections.  He has no drug abuse.  But because of the nature of the offense, of course, we're not doing that.  He's accepting that this is an offense that requires some kind of punishment.

So when we get to deterrence and protection of the public, the question is is two years enough for that?  Your Honor, my answer to that is yes.  24 months is a significant sentence. The probation office was not far from me at 27 months, but I think the 24-month sentence should be evaluated in context. The 21 months, as I said before, already takes into account leadership, and so the enhancement is what causes it to -- causes us to get all the way higher to where the Court is now.

No other co-defendant has received a sentence as high as 24 months, except those who already had a criminal record, and so they're higher in the guidelines.  The highest sentence was 21 months for Mr. Patrick.  Jason Patrick.  Ritzheimer received a sentence of a year and a day.  He also received some custodial time in a halfway house.

Your Honor, the -- I've pointed out that Mr. Payne started accepting responsibility earlier than any other defendant in this case by his stepping out of the car and putting his hands up.  He was the first arrested that way, the first to begin to diffuse the situation and to stop what he was doing.

If part of the goal of sentencing is to send a message, I

guess I would ask what is the message that's sent when the

person who started accepting responsibility the earliest, who

did not destroy artifacts, who did not go to trial, who pled

guilty, who renounces the theory that motivated him -- and

he'll tell the Court that he's not -- he's not motivated the

way he was before -- why should he be punished so much more

severely than the others who have different circumstances?

So I think the Court can consider disparity among

co-defendants, especially when considering the 24-month

recommendation.  Two years of a person's life is a very serious

sentence.  It alerts protesters or would-be protesters that

there are consequences, that two years is a long time.

A downward variance would send a message, however, and it

would send a message that there is mercy and compassion in the

justice system, that we don't seek to punish people merely to

punish, but also to understand the unique human frailties that

make up the person before the Court.

Mr. Payne was 17 when he joined the Army.  He was in there

for over four years.  The impressions that were made on him had

an effect that I think help us understand why he was so

attracted to an organization that fought government oppression;

that felt that protecting people, above all else, was

important; and how he could get caught up in that mindset and

believing he was doing right.

I think what differentiates Mr. Payne from some other

1    defendants that the Court has seen, not just in this case, but

2    generally, is that he believed he was doing the right thing

3    even though we all fully understand what he did was not right.

4        He was motivated by an ideal that is not the right ideal.

5    He will tell the Court that he accepts this Court's authority

6    that he's no longer going to be making the kind of argument

7    against the Court's authority and the government he made

8    before, and I found him to be honest and sincere in that.

9        I think there's a time when people can be misplaced on

10   their path because of what's occurred, and then a moment of

11   awareness can happen.  For example, an arrest under difficult

12   circumstances; the death of a good friend, LaVoy Finicum; and

13   the ability to think through what the consequences of one's

14   actions are.

15       Mr. Payne is at that moment where he has been able to

16   think through the consequences.  So, Your Honor, for all of

17   those reasons, I would ask the Court to impose a sentence of 24

18   months in this case.  It's a significant sentence, a sentence

19   higher than any co-defendant, a sentence that would send a

20   message that one must respect the authority of the Court and

21   the law and not -- not take actions that disrupt the government

22   functions the way Mr. Payne did.

23       I know Mr. Payne wants to address the Court, so I'll stop

24   there.  Of course there's much more in the family -- in the

25   family letters and those things, but I understand the Court

1  recognizes that part of his characteristics.

2           THE COURT:  Does Mr. Payne want his supervision, his

3  ultimate supervision, to be transferred to the District of

4  Montana?

5           MS. HAY:  Yes, Your Honor.

6           THE COURT:  Okay.  Mr. Barrow, is there anything you

7  want to say in response before Mr. Payne addresses the Court?

8           MR. BARROW:  Only that what the defense is asking for

9  is effectively a time-served sentence, and we simply think

10 that's not enough, and it doesn't meet the 3553 factors.  But

11 with that, I'll -- I'll submit.

12          THE COURT:  All right.  Mr. Payne, good morning.

13          THE DEFENDANT:  Good morning, Your Honor.

14          THE COURT:  I have a couple of matters I have to

15 address with you first.  And that is I need to be sure you've

16 seen the latest version of the presentence report.  It's dated

17 or was filed February 22nd.  Have you seen that and reviewed it

18 with Ms. Hay?

19          THE DEFENDANT:  I don't believe I've seen the latest.

20          THE COURT:  Okay.  Why don't you take a seat and be

21 sure you've gone through it.  We can't continue without that

22 happening.

23     I think one of the primary most recent changes is the

24 notation of how the matter was resolved as to Mr. Payne in

25 Nevada.

1    MS. HAY:  Your Honor, we discussed it at length.  We

2    hadn't looked at the actual copy.

3    THE COURT:  Okay.  Well, if you -- if you want to go

4    through this, I'm really not allowed to continue until you've

5    seen the presentence report and let me know if there are any

6    issues in it, so --

7    THE DEFENDANT:  If that's necessary --

8    THE COURT:  Do you have it there?

9    THE DEFENDANT:  I do have it here.

10    THE COURT:  Take a minute and go through it and make

11    sure there's nothing there that is of concern to you.

12                        (Pause-in-proceedings.)

13    THE COURT:  All right.  Are you satisfied you've had

14    enough time to review the presentence report?

15    THE DEFENDANT:  I feel comfortable with it,

16    Your Honor, yes.

17    THE COURT:  Did you get to see all the material

18    Ms. Hay sent me, including Dr. Brown's report, Dr. Best's

19    report, the letters that came from your personal group of

20    supporters?

21    THE DEFENDANT:  I did.

22    THE COURT:  Is there anything you want to add?

23    THE DEFENDANT:  I would, Your Honor.  First off, a

24    couple of apologies to the Court.  I generally like to speak

25    off of the cuff and so I hope that reading from prepared notes

1    doesn't decrease from the genuineness.

2            THE COURT:  Not at all.  Not at all.

3            THE DEFENDANT:  The second one is I forgot my reading

4    glasses, so if I struggle, my apologies on that.

5            THE COURT:  If you need to hold the pages closer, you

6    can do that.

7            THE DEFENDANT:  It's actually the opposite for me.

8    Thank you.

9        As briefly as possible, I would like to vocalize the

10   apology from the letter that Your Honor has already received.

11   My apology first to those whose lives were disrupted by my

12   words and actions, including those whose duties were impeded.

13   And I personally understand the effect of feeling as if you're

14   not able to perform your duty.  I understand the -- the -- even

15   the emotional stress that may have caused as an aside from just

16   the professional responsibility.

17       I hope that the two years since have served for the repair

18   of whatever harm had been done and that whatever healing was

19   needed has had its time to mend.

20       I would also like to apologize generally to the American

21   people.  In my youth, ignorance, and arrogance, I have

22   tarnished the reputation earned by my former service.  The last

23   two years of incarceration have served to reform my intended

24   direction.  My efforts on political activism and protest are

25   over.

1    And I'm a little bit lost as to the arguing against this,

2    so I just wanted to clarify it; but I -- I understand that

3    this -- this terrorism enhancement, and such, I'm not -- I'm

4    not arguing against it.  I wanted to clarify that in my letter,

5    Your Honor, I was -- I was understanding what it meant.  I just

6    wanted to display that I -- I understood what it was, that this

7    was a crime of impeding federal officers, or a conspiracy to

8    impede, and that attached to that was this terrorism

9    enhancement that was designed to affect the government -- or,

10   excuse me, that my activity was designed to affect the

11   government.  So I wasn't trying to change your -- that part of

12   the plea.

13       And so as a convicted felon and possibly a terrorist, I

14   may no longer defend even my family.  I certainly have no

15   intent on trying to organize, speaking with others about

16   organizing.  And just to vary from my notes here, again, I

17   don't disagree with what Your Honor said at the beginning of

18   this hearing about conditions that I not speak to certain

19   individuals, and -- and I'm amenable to any of those things and

20   understand them, understand the need for them.

21       My militia ties and former sentiments are severed.  I

22   want -- excuse me.

23       I can tell you also, Your Honor, that I accept the

24   authority of this Court.  I also am going to follow all of the

25   requirements of my supervision when one day I'm released from

custody.  I want nothing more than to return to my fiancée, our

family, and our children, continue our lives and continue to

serve my community in any way that I can.  I shall work to meet

the restitution requirements with all expediency and shall do

my utmost to comply with all of the requirements of supervised

release.

I'm aware of the severity of my words and actions and can

only hope that my future conduct might serve to exemplify the

sincerity of my sentence today.

It is my desire from here on out to live a life worthy of

a servant of the Lord Almighty.  Blessed be He.  The safety of

my family is and always has been in His hands and as is the

rest of the country.

Thank you for the opportunity to speak, Your Honor.

THE COURT:  Go ahead and take a seat, please.

Mr. Barrow, any presentation on behalf of the victims for

this proceeding?

MR. BARROW:  No, Your Honor.  I know the Court is

familiar with the materials, and we don't have anything more to

add.

THE COURT:  Give me just a moment, please.

Before I impose sentence, I need to address, once again,

the misuse of the "terrorism" label -- even just now in

Mr. Payne's allocution.  In the Sentencing Guideline 3A1.4,

captioned "Terrorism," there is a requirement to increase an

1    offense level by 12 levels if the offense is a felony that

2    involved or was intended to promote a federal crime of

3    terrorism.  This is not that crime.

4         There is an application note to that guideline.  Note 4.

5    And I'm going to read all of it so the context is not

6    misunderstood.  Because, repeatedly, through the course of this

7    case, this terrorism label has been misused and improperly

8    applied to the conspiracy charge that was the driving offense

9    in these cases.

10        Application Note 4 is titled "Upward Departure Provision."

11   It reads, "By the terms of the directive to the Commission in

12   section 730 of the Antiterrorism and Effective Death Penalty

13   Act of 1996, the adjustment provided by this guideline applies

14   only to federal crimes of terrorism."

15        Again, the crime for which I'm sentencing you, Mr. Payne,

16   is not a federal crime of terrorism.

17        The note goes on to say, "However, there may be cases in

18   which (A) the offense was calculated to influence or affect the

19   conduct of government by intimidation or coercion, or to

20   retaliate against government conduct but the offense involved,

21   or was intended to promote, an offense other than the offenses

22   specifically enumerated in 18 U.S.C. Code § 2332b(g)(5)(B),"

23   which is the terrorism law.

24        So, again, what the note is talking about is there may be

25   cases outside of the federal felony crime of terrorism where an

1   enhancement is nevertheless warranted by way of a departure.

2        So A, I read, or it might be if, B, the offense involved

3   or was intended to promote one of the offenses specifically

4   enumerated in Section 2332b(g)(5)(B), but the terrorist's

5   motive was to intimidate or coerce a civilian population rather

6   than to influence or affect the conduct of the government by

7   intimidation or coercion or to retaliate against government

8   conduct.

9        "In such cases" -- so the cases, again, outside of the

10  federal felony of the federal crime of terrorism.  "In such

11  cases" -- which I think this is, and the parties acknowledged

12  it was by their plea agreement, quote -- "an upward departure

13  would be warranted except that the sentence resulting from such

14  a departure may not exceed the top of the guideline range that

15  would have resulted if the adjustment under this guideline had

16  been applied."

17       So all that says is is that if you've got the conduct that

18  is calculated to influence or affect the conduct of government

19  by intimidation or coercion, you can't depart more than 12

20  levels.  That's basically the rule of this guideline.  And you

21  all agree there would be a 10-level upward departure.  I've

22  applied a 9-level.

23       I don't know if that makes any sense to you, Mr. Payne;

24  but you're not being sentenced for terrorism.  I'm not

25  enhancing a penalty for terrorism.  I'm focusing on the crime

1    you admitted by plea -- conspiracy to impede an officer of the

2    United States by force, threat, or intimidation.

3        So that is our focus here.

4        What is a reasonable sentence?  A lot has been said about

5    Mr. Payne having changed over the last two years.  A lot has

6    happened over the last two years with respect to events

7    involving the Bunkerville standoff, the prosecution of that,

8    Mr. Payne's role in that.  And I suppose it needs to be noted

9    he was not acquitted of criminal conduct there, but the case

10   was dismissed by order of the Court for serious discovery

11   violations.  And, as I understand it from public reporting,

12   there's now a motion pending -- still pending in that case over

13   the finality of that decision.

14       So I don't know, Mr. Payne, if that case is over or not

15   over for you.  I don't know if the United States will appeal

16   Chief Judge Navarro's final decision, whatever it is.

17       I do know that when you pled guilty here it was

18   anticipated that I should not sentence you until the Nevada

19   case was resolved, and I think it's probably a fair

20   observation, in hindsight, that back in August of 2016, July of

21   2016, you would have been thrilled if you thought the exposure

22   was 37 to 46 months, because I know that you were facing very

23   serious charges in Nevada, and the question was how much was --

24   how much was going to be added to your exposure for your crime

25   in Oregon based on conduct there?

1    Well, it turns out, at least at this very minute, nothing.

2  Nothing.

3    You were held in custody in Oregon, then, from late

4  January until shortly after your plea in 2016, and then you

5  were transferred to Nevada, because you were detained in

6  Nevada.  It had nothing to do with the Malheur case.  Your

7  detention from them, until when you were released last

8  December, was because you were awaiting trial in Nevada, and

9  you were not entitled to release there based on all of the

10  factors that had been considered.  That had to do with the

11  seriousness of the charges alleged there.  Then you got

12  released there, and I was asked to release you here so that you

13  could, in fact, spend time with your family over the holidays,

14  you could prepare with your counsel there, with the

15  co-defendants, for whatever was going to come.

16    I'm told -- and Ms. Hay has done an extraordinary job

17  pulling together an argument in support of what is there --

18  that is mitigation material that I should consider in deciding

19  whether to impose a sentence below the guidelines.  I'm told

20  you've changed, you've disavowed your association with

21  aggressive and violent confrontations, and then I see you in

22  photos at the Bunkerville standoff, the very -- I use the word

23  "hubris" when I responded to Ms. Hay.  It was as if you were

24  celebrating, of course, the win, but -- but in a way that, once

25  again, thumbed your nose, I'll say it politely, to the rule of

1   law and to the Constitution.  It was as if none of the orders

2   of release conditions mattered to you.  You know, the grin on

3   your face, that -- at the Bundy ranch, the big smiles with --

4   when you were photographed with Ammon Bundy and Mr. Ritzheimer,

5   those convey something different than a disavowal of those

6   associations.  So it's really hard for me to sort out in

7   Ms. Hay's arguments all of the passion around imposing a low

8   sentence because you've changed.  You have articulated

9   eloquently an apology and an acceptance of responsibility when

10  it's in your interest to do so.

11      You've served your country in the most extreme of

12  circumstances in terms of combat in Iraq, and you come back and

13  take up arms against the United States.  You're said to have

14  changed your professions of allegiance to these ideas that were

15  recorded in the Operation Mutual Defense telephone meetings,

16  and I have Dr. Best's assessment that you're not a threat to

17  the community, and I totally hope that is true.  I hope that

18  for you.  I hope that for your family, for the people who care

19  about you.  I hope I'll be able to return to Montana and

20  dissociate completely with the idea that you can take up arms

21  to promote an idea with force, threat, or intimidation.  Of

22  course, as a convicted felon, you won't be able to lawfully

23  possess a firearm.  You've acknowledged that in your

24  allocution.  I think that is what you meant when you were

25  talking about not being able to protect your family.

1      It's complicated; you're complicated.  And I'm here faced

2    with this very significant responsibility to hold you

3    accountable for serious criminal conduct in Oregon and to take

4    into account not just the negative things I've happened to

5    highlight here about your conduct before and after the Malheur

6    events, but you're -- but all of you.  Your personal history

7    and characteristics.  It has been a very helpful presentation

8    that Ms. Hay made with respect to the help from the

9    professionals here, and it's clear you're -- you're beloved by

10   people back home, people who know you in that context and not

11   as a leader of an armed occupation.

12      So I hope you've changed, and I hope that the profession

13   of this progress over two years is genuine; but I think a

14   reasonable person would have a basis to be not so sure,

15   especially in light of the very recent behavior in Nevada after

16   your release.

17      The relative sentence here and the -- this argument that

18   you are the most culpable of the defendants convicted in the

19   Malheur case is certainly a reference point.  I'm sure if

20   Mr. Barrow were permitted to argue, he would go on to talk

21   about the relative responsibility of people who were found not

22   guilty in the jury trial.  That is our system.  That was the

23   day in court they had, and the jury in that case concluded for

24   each of those defendants the charge was not proved beyond a

25   reasonable doubt as to each and every element, so they're

1    acquitted.  And on the one hand, I'm asked, by the prosecutor,

2    to note you're the most culpable, when they're acquitted in a

3    jury trial; and, on the other hand, I'm asked by your lawyer to

4    look at the last -- the highest sentence previously imposed,

5    but for people who were clearly not as involved as you in the

6    leadership and the intimate planning that went into this really

7    unheard of event.

8         So we have the guidelines as a starting point.  I have

9    authority to sentence you above the guidelines, up to the

10   maximum of six years, and I think there are probably some who

11   might argue that that would be warranted here, given the

12   seriousness of what you helped to produce.  A conspirator,

13   after all, is legally responsible for everything that's done in

14   the course and scope of the conspiracy.

15        So, as Ms. Hay makes the point, well, you weren't recorded

16   as saying some of the vile things that were recorded and were

17   posted over and over again, you are liable for everything that

18   was said and done and reasonably foreseeable acts of the

19   conspiracy.

20        The government's arguing this 41 number that they agreed

21   to.  They -- because they can't argue for anything higher, that

22   happens to be about the mid range here.

23        I have sentenced -- please correct me if I'm wrong,

24   Ms. Hay or Ms. Barrow -- Mr. Barrow, I think I sentenced

25   everyone to a low-end sentence.  I think that's right.

1      MR. BARROW:  That's my recollection as well,

2 Your Honor.

3      THE COURT:  And so I don't see any reason to treat

4 you differently in that regard.

5      I've made adjustments, Mr. Payne, in this nine-level

6 enhancement that was an upward departure.  I enhanced one level

7 less than you even agreed to.  I questioned whether I should

8 give you three levels off for acceptance, and I think the

9 arguments are there that I didn't need to; but in respect for

10 your agreement, I gave you the benefit of that.  If I hadn't,

11 the low-end sentence would be not 37 months, but that one level

12 there would have taken us to 41 months, and that's after two

13 levels off for early resolution, which I think, too, could have

14 been questioned because of your litigating this motion to

15 withdraw and all of that.  For whatever benefit the government

16 agreed to give you this discount, it was washed away with the

17 need to have to litigate that all over again.

18      So you could have been up to a 51-month low-end sentence

19 and right up to the maximum penalty, even with those things in

20 mind.  So one could argue all around this.

21      In my judgment -- Mr. Payne, would you stand, please? -- I

22 think a low-end sentence in the guideline range, as I've

23 calculated it, is sufficient to punish your crime and not

24 greater than necessary to accomplish all the other purposes.

25 So that is the sentence I'm imposing.  37 months.  There's a

1    $100 statutory assessment that you have to pay.  Please get it

2    paid before you get moved into the federal system, because

3    they'll take money off your books every month until it's paid,

4    and it will interfere with just the funds you have on account

5    for your personal needs.

6        The $10,000 restitution obligation to which you previously

7    agreed is already of record.

8        Is there a recommendation, Ms. Hay, for designation?

9            MS. HAY:  Your Honor, could I email the clerk with

10   that?  I'm not certain if there's someplace in Montana that he

11   would be eligible, but he would like to be as close as possible

12   to family.

13           THE COURT:  Well, let me address this eligibility

14   issue too.  When Mr. Payne, to his credit, surrendered, as I

15   directed him to Pretrial Services at the Portland Airport, and

16   we had a hearing after about release, I posited the notion of

17   having him released from custody at sentencing and then

18   surrender back, in order that we could have a technical

19   self-surrender.  I think that's probably not advisable here.

20   It's a -- it's pretty much a sham.

21       But I am going to add to the judgment this Court's

22   recommendation that Mr. Payne be given credit as if he had

23   voluntarily surrendered because of his compliance and the trust

24   the Court put in him to allow him to travel without supervision

25   from Nevada to Portland and surrender without incident to the

1    pretrial release officer.

2         So I want that language in the judgment order because I

3    think that is an equivalency.  Not exactly the same, but it's

4    as close as walking out one door and coming back to surrender

5    in another one today, which, I think, as I said, would be a

6    sham.

7         I'll recommend that the defendant be offered all

8    programming for which he qualifies while in the Bureau of

9    Prisons' custody, that he be designated to the lowest security

10   facility for which he qualifies.

11        He is subject to supervised release upon his completion of

12   his prison sentence.  As such, because all his original

13   contacts are in Montana, I am directing that his supervised

14   release be managed out of the District of Montana and that it

15   be formally transferred there as soon as he's released from BOP

16   custody.

17        The period of supervision is three years.  During that

18   time, Mr. Payne, you have to follow all the standard conditions

19   of supervision.  These include conditions similar to what you

20   were expected to do while you were on pretrial release in

21   Nevada.  There are additional recommended conditions.  They've

22   been set out in the presentence report.  I'm about to adopt

23   them all, Ms. Hay, unless there's an issue with any of them.

24             MS. HAY:  No, we don't object to any of those.

25             THE COURT:  In addition to the no contact with

1   co-defendants, I want to be clear that that is co-defendants

2   who were named in the Nevada case or the Oregon case, and I

3   want counsel to confer and to get us an agreed list of the

4   names from the OMD material so that he has a no-contact

5   requirement there.

6           MR. BARROW:  I can do that now, Your Honor, or do you

7   want me to give it to Pretrial or --

8           THE COURT:  I want you to speak to Ms. Hay to be sure

9   you are in agreement.  I don't want there to be any need to

10  litigate things after everyone leaves today.

11      No contact, Mr. Payne, means that.  You can't reach out to

12  them.  If they reach out to you, you have to ignore it.  If

13  once you're out of custody you go to a place and they're there,

14  you have to leave.  "No contact" means direct or indirect.  You

15  can't ask other people to do it on your behalf, and if you do,

16  it's a violation of your conditions of release.

17      "Supervised release" means just that.  Your sentence

18  literally continues through supervision.  You're released on

19  supervision.  And if you violate the conditions of release, you

20  can go back to prison.  Don't possess a gun; don't possess

21  ammunition.  It's a violation of law for you to do that once

22  the conviction is final.  It's a fundamental condition of

23  supervision that you obey all laws, and so those are just two.

24  Do you understand?

25          THE DEFENDANT:  I understand.

1          THE COURT:  Okay.  What else do we need to address?

2      Mr. Barrow?

3          MR. BARROW:  Your Honor, the government hereby moves

4  to dismiss Count 2.

5          THE COURT:  Thank you.

6      With respect to your rights on appeal, Mr. Payne, I'm not

7  going to try to articulate whether you do or you don't have a

8  right to appeal.  You made a motion to withdraw your guilty

9  plea.  I don't know if that's covered by the waiver of appeal

10  provision of your plea agreement or not.  I'm simply not going

11  to offer any opinion on that.

12      What I will say is this:  Every person who hasn't given up

13  his right to appeal has 14 days from the entry of judgment to

14  file a notice of appeal.  Ms. Hay can help you with that.  If

15  she does -- if you and she decide to file a notice of appeal

16  and if the government believes it's in violation of your plea

17  agreement, they will raise that, and the Court of Appeals will

18  decide whether it is or isn't something you can go forward on.

19  But it's my job to be sure you know there's a 14-day window,

20  and if you wait too long, you can lose any right to appeal what

21  you still have.

22      Do you understand?

23          THE DEFENDANT:  I understand.

24          THE COURT:  Ms. Hay, anything else?

25          MS. HAY:  Would the Court consider recommending that

1    Mr. Payne participate in the RDAP program, if he desires, given

2    what Dr. Best recommended?

3                THE COURT:  Yes.  One final point on conditions of

4    supervision.  In light of Dr. Best's testimony about his need

5    for and the likelihood that he would benefit from treatment in

6    the VA program once he's out of custody, I want to add as a

7    condition of supervision that he have an updated mental health

8    evaluation upon release and that he comply with any treatment

9    directives in that evaluation as a condition, which include, as

10   Dr. Best mentioned, if medication was warranted and a

11   professional prescribed medication to deal with sleep issues or

12   anything else that have to do with your ability to comply

13   successfully with your supervision, you have to take the

14   medication.

15        PTSD is a complicated diagnosis.  I'm not a professional.

16   I know that sometimes it includes using medications to

17   facilitate a person's recovery and management.  But that's

18   clearly an issue that is -- you're going to be working with as

19   you go forward, and I want to be sure that as part of your

20   supervision that's taken into account.

21        So if the evaluator has determined you need to follow a

22   mental health treatment program, you need to go forward with

23   that as a condition of release.

24        I do recommend that all treatment be focused first on the

25   services available through the Veterans Affairs, since

1    Mr. Payne is a veteran and already these issues have been

2    focused on his service.  So they're the first line of support,

3    I would imagine.

4         All right.  Anything else?

5              MR. BARROW:  No, Your Honor.  Thank you.

6              THE COURT:  Ms. Hay, anything else?

7              MS. HAY:  No.  Thank you, Your Honor.

8              THE COURT:  All right.  Thank you for your work on

9    Mr. Payne's behalf.

10        Mr. Payne, good luck to you, sir.

11        Okay.  We're in recess.

12                         (Hearing concluded.)

1              C E R T I F I C A T E

2

3         United States of America v. Ryan Payne

4                  3:16-cr-00051-BR-4

5                      SENTENCING

6                  February 27, 2018

7

8         I certify, by signing below, that the foregoing is a

9   true and correct transcript of the record, taken by

10  stenographic means, of the proceedings in the above-entitled

11  cause.  A transcript without an original signature, conformed

12  signature, or digitally signed signature is not certified.

13

14  /s/Jill L. Jessup, CSR, RMR, RDR, CRR, CRC
    _____
15
    Official Court Reporter      Signature Date: 4/20/18
16  Oregon CSR No. 98-0346       CSR Expiration Date:  9/30/20

17

18

19

20

21

22

23

24

25